# CHARLESTON.

### PARISH FORK OIL CO. v. BRIDGEWATER GAS CO.

Submitted January 24, 1902.   Decided March 29, 1902.

1. OIL LEASES—*Abandonment—Forfeiture.*

An agreement whereby certain lands, in consideration of fifty dollars, are granted, demised, leased and let for the sole and only purpose of boring, mining and operating for oil and gas, and laying pipes and building tanks, stations and houses thereon to take care of the products, for the period of fifteen years, and providing that the lessee shall complete one well on the premises within one year from its date, or pay the lessor a rental of fifty cents an acre for each year the lease may remain in full force after the first year, immediately after which provision the following stipulations are written: "But it is agreed and understood that the fifty dollars paid in cash is to pay all rentals on this lease for the period of one year from the date hereof; it is further agreed that when the first well is completed on said premises, then all cash rentals shall

cease," does not bind the lessee to do anything further after completing one well on the premises, and, upon his abandonment of further operations upon the premises for more than eighteen months, leaving the well unprotected so that it caved in and partially filled up, the lessor, after waiting a year or more, from the date of abandonment, had the right to lease the land to another.   (p. 585, 586).

2.  OBJECT OF OIL LEASE—*Discovery of Oil—Title—Rights and Duties of Lessee.*

The principal purpose and design of the parties to such a lease, clearly discernable from its terms, being the production and marketing of the oil and gas in the land, for their mutual benefit, mere discovery of oil, by exploration under it, vests no title to it in the lessee, but does vest in him the right to produce and take the same in accordance with the terms and conditions of the contract.   In such right the lessee will be protected, but he must proceed to exercise it with reasonable promptness and diligence.   (p. 587).

3.  OIL LEASE—*Construction.*

When its terms will permit it, under the rules of law, an oil lease will be so construed as to promote development and prevent delay and unproductiveness.   (p. 591, 593).

4.  ABANDONMENT—*Intention—Rights of Lessor.*

The law recognizes a distinction between the abandonment of operations under an oil lease and an intention to abandon or surrender the lease itself.   Unless bound by the terms of the lease so to do, it will not permit the lessee to hold the lease without operating under it, and thereby prevent the lessor from operating on the land or leasing it to others.   (p. 593).

Appeal from Circuit Court, Wirt County.

Action by the Parish Fork Oil Company against the Bridgewater Gas Company.   Decree for defendants and plaintiff appeals.

*Affirmed.*

S. D. TURNER, D. C. CASTO and CAMPBELL, HOLT & DUNCAN, for appellant.

T. A. BROWN and W. N. MILLER, for appellee.

POFFENBARGER, JUDGE:

This is an appeal from a decree of the circuit court of Wirt County, made in two causes which had been consolidated.   The Parish Fork Oil Company, a co-partnership, claiming under a

lease of one hundred and eighteen and one-half acres of land, executed by Jacob S. Swisher to E. R. Woodyard, and dated June 4, 1894, had entered upon the land in August, 1898, and drilled a well about two hundred feet deep, which was completed sometime in September, 1898. The well was shot and it was found to be a producer of oil in small quantities, the man who drilled it having taken out with the sand pump about one-third of a barrel, but no tubing was put in it and it was not pumped. In the spring of 1899, the drilling machinery, belonging to one Abram Pearson, who drilled the well for the lessees under a contract, moved all the machinery away, and the well was, to all appearances, abandoned. No further visible work was done upon the land by the lessees until early in June, 1900. The cash consideration mentioned in the lease was fifty dollars and it was therein agreed and understood that said fifty dollars was payment of the rental for one year, that is, from June 4, 1894, until June 4, 1895. The lease further provided that the lessees should "complete one well on said premises within one year, or the said E. R. Woodyard shall pay to said Jacob S. Swisher rental as hereinafter provided." A further provision as to rent was, that the lessee should pay "fifty cents per acre for each year that this lease may remain in force after the first year." A further stipulation, as to the payment of rent, is as follows: "It is further agreed that when the first well is completed on said premises, then all cash rentals shall cease." Another important clause of the lease reads as follows: "It is agreed that this lease shall remain in force for the term of fifteen years from this date, and as much longer as the premises are operated for oil and gas." By its terms, the lessor was to receive one-eighth of all the oil produced and saved from the premises and fifty dollars per year for the gas from every gas well on the premises, the product of which might be marketed and used off the premises. The rentals were paid in advance each year until June 4, 1899, the last payment having been made June 2, 1898. Prior to the resumption of work by the lessees, Swisher executed a subsequent lease, sometime in 1899, to J. W. Bell and one Hewitt, but it was allowed to expire by reason of non-payment of rental. Then Swisher executed another lease, covering the same land, to said Bell, who was an employe of the Bridgewater Gas Company, a Pennsylvania corporation, which lease was dated February 7, 1900, but was not recorded until sometime in April,

1900. This lease was assigned to the Bridgewater Gas Company on the 1st day of August, 1900, and Bell says he took the lease for said company. Early in August, 1900, the claimants, under the two conflicting leases undertook to begin operations on the land, each placing materials upon the ground and beginning the work of operation. This resulted in the institution of these two suits. On the 15th day of August, 1900, on a bill of the claimants under the Woodyard lease, praying a cancellation of the lease made to Bell as a cloud upon their title to the leased premises, and general relief, an injunction was awarded by Hon. G. W. Farr, judge of the 5th judicial circuit, restraining the Bridgewater Gas Company, its agents and employes, from interfering with the premises. On the 21st day of August, 1900, upon the bill of the Bridgewater Gas Company, praying a cancellation of the Woodyard lease and an injunction against the claimants thereunder, and general relief, an injunction was granted by Hon. Reese Blizzard, judge of the sixth judicial circuit, restraining E. R. Woodyard, W. M. Cox, A. F. Dennison and S. B. Sayre, their agents, servants, employes and assignees from going upon the premises and from doing any of the acts mentioned in the bill. An amended bill was afterwards filed by the Bridgewater Gas Company and all the bills were answered, and affidavits and depositions were taken and filed by all the parties. Hon. Lewis N. Tavenner, the judge of said court, being a witness in the causes, Hon. Walter Pendleton was, by agreement, selected to try them, and, on the 22d day of May, 1900, the causes were consolidated and heard together and a decree was entered dissolving the injunction awarded to the claimants under the Woodyard lease, dismissing their bill, cancelling the said lease of June 4, 1894, and perpetuating the injunction granted the Bridgewater Gas Company. From this decree, an appeal has been taken by the parties interested in the Woodyard lease.

The question of paramount importance is, whether the lessees who drilled the well under the lease of June 4, 1894, abandoned the lease, for that question must be taken into consideration in more than one aspect of the case. Its determination necessitates a fuller statement of the facts than has been given. At the time the well was drilled, the Woodyard lease was owned by S. E. Mobley, E. Jones, W. M. Cox and E. R. Woodyard. Mr. Woodyard had retained a one-fourth interest in the lease

and the balance of it had been assigned, directly or indirectly, to the other parties, each of whom held distinct fractional interests. D. C. Mobley, the husband of S. E. Mobley, had the management and control of the operations upon the land, as agent of the owners of the lease. After the well had been drilled, shot and cleaned out, and a showing of oil found in it, Mobley located another well and talked of going on and drilling more wells ·with the intention of connecting and operating them together by power from one plant, but that was not done. The contractor, Pearson, testifies that he was to go right on and drill another well, when notified to do so, but that there was some delay in paying him for the work he had done and he received no notice to begin work on a new well, and his tools remained at the well during the fall and winter, and, in the spring, he moved them all away. It is admitted that, at the time of the ·completion of the well, there was a failure of water by reason of dry weather in that locality, but it is uncertain how long that condition existed. Shortly after the cessation of work on the lease, Mobley became interested in other business and declined the further management of the work on the lease, and then his wife sold her interest. He and W. M. Cox testify that when he gave up the management, Cox was to take charge of it. Cox took sick with pneumonia in the fall and was unable to do anything during the greater part of the winter. In the year 1898, Cox was engaged in oil prospecting and development in Ohio near Marietta, and he says that as soon as be become able he went over there to look after some business and then came back to Parkersburg and purchased machinery and supplies for the development of the Swisher land under the Woodyard lease, but, before these tools and supplies were shipped, he was notified by J. W. Houke, that Swisher had no title to the land and · that the legal title was in him (Houke) and one T. H. Murphy, both of Parkersburg, and thereupon he abandoned the idea of resuming work on the lease until the title could be perfected, and went back to Ohio. He claims to have written from Marietta five letters to Swisher, urging him to perfect his title. These letters were dated May 10, June 17, August 12, September 17, and October 22, 1899, and addressed to Swisher at Elizabeth, West Virginia, but Swisher denies that he ever received any of them, and further says that, at that time, Elizabeth was not his postoffice. Cox says the letters were inclosed in return

envelopes and that none of them ever came back to him.  The
Swisher title was in this condition : It was perfect and undis-
puted as to sixty-eight and one-half acres of the land and
the well had been drilled on that part of it.  The other fifty
acres was in two tracts, one containing twenty-one acres, and the
other twenty-nine acres.  Houke and Murphy, in the year of
1881, had sold these two tracts to one Isaac Trader, executing
to him a title bond.  Swisher had purchased the interest of
Trader and assumed the payment to Houke and Murphy of three
notes for the sum of sixty-six dollars and sixty-six cents each,
executed by Trader for purchase-money.  Swisher had paid off
two of these notes and seventy dollars on the principal and in-
terest of the third one, as he contends.  The only dispute as to
these payments is in respect to thirty dollars, which Swisher
handed to Lewis N. Tavenner on the 27th day of March, 1889,
to be paid to Houke.  Judge Tavenner has no recollection of
handing the money to Houke, but he is satisfied that he either
did that or that it was included in some of the checks which he
filed.  From this, it is clear that nothing stood in the way of
Swisher's obtaining a deed for the fifty acres of land except the
payment of a very small amount of money.  However, Houke
says Swisher had given him, by verbal contract, in consideration
of forbearance, an interest in the mineral in the land.  It is also
shown that Mr. Woodyard, the lessee, knew the condition of
Swisher's title at the time the lease was executed.  Cox's only
effort to get Swisher to perfect the title was the writing of said
letters.  He never went to see Swisher about it, nor did Wood-
yard or any of his associates.  In the winter of 1899, Cox was
sick again for a considerable time, and, it is claimed by the ap-
pellants here, that all this long period of delay is excused and
accounted for by these circumstances, failure of water, bad
weather, Cox's sickness and defect of title, and that they never
had any intention of abandoning the lease.  On the other hand,
it is claimed that the appellants actually abandoned the lease,
and are now setting up these matters as mere pretenses and sub-
terfuges, and attention is directed to their long absence from
the premises, the condition in which they left the well, and their
permitting the machinery which was on the ground to be taken
away.  How long there was a lack of sufficient water to carry on
the work, does not appear, but there was certainly water during
the winter, and it is shown by the testimony in the case that

such work could be, and was, carried on in that part of the country, during the winter. If the well was protected in any way during the winter from the surface water and from the throwing of obstructions into it, it was only by a board laid over the top of it and held in place by a wrench or some tools. Pearson says the tools were left hanging in the well. Swisher and others say there was a board over it. When Pearson moved his machinery away, one Ash, who was assisting him, cut a wooden block and plugged the well with it, and this probably remained in it for about a year. Only two pieces of casing were put in and these were not of sufficient length to go down far enough to prevent the well from caving nor to shut off from the well what is called, "surface water," water which comes into the well above the oil sand. No examination of the well seems to have been made until after these suits were brought. Swisher and Bell testify that, in January, 1901, they took a line, tied a piece of cast iron to it, weighing several pounds, and with that measured the depth of the well and found that it was then only one hundred and four or one hundred and five feet deep, and the casting brought up with it clay or other substance which was of the character of that which caves into an unprotected well in that locality. They also found that water stood in the well to within twelve or thirteen feet of the top and that there was but a scum of oil on it. It further appears from the testimony that the opening and cleaning out of a well in that condition is more expensive and difficult than the drilling of a new well. Other pertinent facts bearing on the intention of the lessees and the construction of the lease are, that all who were concerned in the well drilled, including Swisher, thought there was oil there in paying quantities. Swisher seems to think the well was injured by shooting, but he gives no good reason for that. Mobley was present when the well was shot, and he says they found lubricating oil at seventy-four feet and it was his judgment that, had they stopped there, the well would have produced one barrel a day. He says that when they went down into the second Cow Run sand and shot the well, it flowed up to within forty-five feet of the top.

It is suggested in the briefs for the appellees that the lease in question here is very similar to the Gartlan lease construed in. *Steelsmith* v. *Gartlan,* 45 W. Va. 27, but, in some respects, they differ widely. In the Gartlan lease the consideration expressed

was only one dollar, while here it is fifty dollars, but that is unimportant, for it is expressly agreed in the lease that the fifty dollars is for the rent for one year. The Gartlan lease did not bind the lessee to do anything but drill one well on the premises. It contained no covenant to pay rent even for delay in putting down the well. By reason of its failure to impose any obligation on the lessee to do any thing after drilling a dry hole, and his abandonment of the premises, it was held that the lease created an estate at will and the lessor had the right to lease the land to another. Here, as has been shown, there is a covenant to pay rent, and one of the pivotal questions in construing the lease is when does that obligation cease? If it continues after an unsuccessful effort to find oil or after it is found, but production is abandoned, it has never ended, unless on the theory of abandonment of the lease. The rent is not made payable in advance, nor is any time fixed for its payment, nor does the lease contain a clause of forfeiture. If the completion of a dry hole on the premises operates a cancellation of the obligation to pay rent, under the clause, "It is further agreed that when the first well is completed on said premises, then all cash rentals shall cease," there would be an end of all obligations or covenants on the part of the lessee, for he is not bound to drill a second well by the terms of the lease. Such construction would class this lease with the Gartlan lease, and abandonment of the premises, after putting down an unproductive well, would end the lease.

A widely different view of the legal meaning of the lease is the one taken by the lessees. It is not contended for in the argument, but, as it serves to throw light on the conduct of the parties and affects the question of intention, so vital in determining whether there has been an abandonment of the lease, it is here given and discussed. Taking the meaning of the clause last quoted to be that the completion of a dry hole, or a well by which oil is discovered but from which none is produced, operates an extinguishment of the obligation to pay rent and vests in them title to the oil in the land, the lessees, after completing this well, refused to pay any more rent, and denied that any was, or would thereafter become, due. Both Cox and Woodyard insisted, after the well had been drilled, that they were not bound to pay any more rent. Soon after the 4th day of June, 1899, the date to which the rent had been paid, Swisher wrote

Woodyard a letter in reference to the rent and the lease, and he says he notified him that the lease was forfeited. Woodyard admits having received a letter from Swisher, but says he does not remember its contents. He says that on another occasion, still later, he saw Woodyard and told him that the lease was forfeited and Woodyard insisted that under the lease he was to pay no rent after the completion of a well, and, on the witness stand in this case, he still insisted that he was not bound to pay any more rent, but that he was entitled to hold his lease without such payment. On the 24th day of August, 1900, Cox made Swisher a tender of the rent up to June 4, 1900, with the interest thereon, but he coupled it with a protest to the effect that no rent was due him. This position of the lessees is based upon the assumption that by drilling a well and finding oil they ac-' quired a vested interest in the oil and gas in that tract of land. Until oil is discovered in paying quantities, the lessee acquires no title under such lease. It simply gives a right of exploration. *Steelsmith* v. *Gartlan,* 45 W. Va. 27; *Oil Company* v. *Fretts,* 152 Pa. St. 451; *Plumbers* v. *Iron Co.,* 16 Pa. St. 483; *Crawford* v. *Ritchey,* 43 W. Va. 252. After the discovery of oil in paying quantities, it is held that title does vest in the lessee, but there is no case which goes so far as to announce that after mere discovery of oil, the lessee, upon the assumption of a vested interest or title, may cease operation, refuse to develop the property, tie up the oil by his lease and simply hold it for speculative purposes, or to await his own pleasure as to the time of development. A well settled principle of law is, that a contract shall be construed as a whole and in the light of the purposes and objects for the accomplishment of which it was made. Oil leases are no exception to the rule, and, as the subject-matter of the lease is peculiar in its nature, the courts have given this principle great latitude in their construction. They are executed by the lessor in the hope and with an expressed or implied condition that the land shall be developed and oil produced. When production takes place, the lease is mutually beneficial. The royalty, which it is stipulated in all these leases that the land owner shall receive, is generally the moving cause of the execution of the lease. If there is one principle that is asserted in *Steelsmith* v. *Gartlan* more vigorously, and with more emphasis, than any other, it is, that the lessee shall proceed to make the lease profitable to both parties and that he shall not

be permitted to tie up the land. The "testing" provided for was manifestly a condition upon which the lease depended. If such test showed no minerals, then the contract was at an end; if it, on the other hand, showed the presence of valuable mines, then the lessees were bound to operate them in good faith for the joint profit of themselves and the owners of the fee. Technical words are unnecessary to raise a condition. If a fair and reasonable construction of the instrument shows that a lease shall depend upon the doing or not doing something essential to the purposes of the contract, the law implies the condition." *Petroleum Company* v. *Coal Company,* 89 Tenn. 381. "It would be unjust and unreasonable, and contravene the nature and spirit of the lease to allow the lessee to continue to hold his term a considerable length of time, without making any effort at all to mine for gold or other metals. Such a construction of the rights of the parties would enable him to prevent the lessor from getting his tolls under the express covenant to pay the same, and deprive him of all opportunity to work the mine himself, or permit others to do so. The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice." *Conrad* v. *Morehead,* 89 N. C. 31. "Forfeiture for non-development or delay is essential to private and public interest in relation to the use and alienation of property. In general, equity abhors a forfeiture, but not where it works equity and protects a landowner from the *laches* of a lessee, whose lease is of no value till developed." *Munroe* v. *Armstrong,* 96 Pa. St. 307. "The landowner is entitled to his royalty as promptly as it can be had. The danger of drainage from his small holding is increased by delay, and the resulting damage, not being susceptible of pecuniary measurement, is therefore not compensable. No such lease should be so construed as to enable the lessee who has paid no consideration to hold it merely for speculative purposes, without doing what he stipulated to do, and what was clearly in the contemplation of the lessor when he entered into the agreement." *Huggins* v. *Daly,* 99 Fed. Rep. 613. "If a farm is leased for farming purposes, the lessee to deliver to the lessor a share of the crops, in the nature of rent, it would be absurd to say, because there was no express engagement to farm, that the lessee was under no obligation to cultivate the land; an engagement to farm in a proper manner, and to a reasonable extent, is necessarily implied. The

clear purpose of the parties to this lease was to have the lands developed, and the half-yearly payments, and the other sums stipulated, were intended not only to spur the operator, but to compensate Ray for the operator's delay or default." *Ray* v. *Gas Co.*, 138 Pa. St. 576. "If oil is found, then the right to produce becomes a vested right, and the lessee will be protected in exercising it in accordance with the terms and conditions of the contract." *Crawford* v. *Ritchey*, 43 W. Va. 252. All the provisions of the contract must be effective, if possible. By its terms, this lease is to be in force for the period of fifteen years from its date and as much longer as the premises are operated for oil or gas. Another provision is, that the lessor shall have one-eighth of the oil produced and fifty dollars per annum for each gas well. It is just as important to the lessor that when discovery of oil is made, the land shall yield him his royalty as it is that discovery shall vest in the lessee title to the balance of the oil. If the lessee shall be permitted to sit down and refuse to produce, after discovery, the lessor loses a part of what he contracted for. The contract bears no such construction as that. What the lessee acquires by discovery is the right to produce and take the oil, paying out of it the stipulated royalty, and not title to the oil as it remains in the land without production. Hence, this provision, that when a well is completed on the premises all cash rentals shall cease, must be taken to mean that such cash rental shall cease only when a *producing* well is completed and *operated* on the premises, or that the completion of a nonproducing well extinguishes the obligation to pay rent and places the lease within the principle announced in *Steelsmith* v. *Gartlan*.

Which is the true construction? If the former be taken, it must be said that, after the completion of this well, the lessor had his right of action on the covenant to pay rent, and, as the lease contains no clause of forfeiture, all he could get, during the whole period of fifteen years, would be his rent of fifty cents an acre, fifty-nine dollars and twenty-five cents per year, if the lessees should determine not to further prosecute their right of exploration. That would as effectually tie up the oil and prevent production by the land-owner or anybody else for a long time, as the construction which the lessees put upon the lease, but, in so construing it, the strict letter of the contract would be adhered to. The lessor agreed to take either the production of

oil, yielding him one-eighth, or a rental of fifty cents an acre for each year that the lease may remain in force after the first year. There is no provision in the lease which compels the lessee to drill a well at any particular time, and if this provision stood alone, unqualified by any other clause of the lease, the drilling of a well might be deferred during the whole period of fifteen years, so that the lessor would receive nothing but the rent. It is useless to enter upon a discussion of the proper construction of this in view of all the other provisions of the lease had no well ever been drilled; for one has been drilled under the lease and that makes it necessary to consider it along with the clause providing for extinguishment of the rentals. If the clause providing for the payment of rent shall be construed according to its very letter, is there any reason why the clause providing for the extinguishment of rent shall not be construed in the same way? If it be so construed, does it not mean that the completion of any well, producing or non-producing, shall put an end to the covenant to pay rent? If the parties meant that the completion of a well to so operate should be a producing well, why did they not say so in the lease? It was a matter of great importance to each of them. Why should the court read into the lease what the parties did not put in? If it means that the completion of any well should have that effect they contemplated a virtual cancellation of their respective rights under the lease with the completion of one well. One rule of construction is, that every clause in a lease or contract shall have some effect, and it is presumed that it was inserted by the parties for some purpose. If a producing well was in the contemplation of the parties when they inserted this clause, they did a vain and useless thing in putting it in the lease. No court would so construe this lease as to compel the lessee, producing oil under it, to give the lessor his royalty and rental too. The rental provision in the lease is never intended to continue after the production of oil begins. The completion of a producing well would end the obligation to pay rent, and this clause, providing for its extinguishment, would be useless in that event. In order to find any reason or purpose on the part of these parties for inserting it, it must be held to apply to a non-producing well as well as a productive well and thus end the obligation to pay rent in either event. But a careful inspection of all of that portion of the lease which relates to the payment of rent will show conclusively that this

is the true interpretation of its meaning. It is as follows: "Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm; to bury gas lines two feet below the surface, when notified so to do, and pay all damages to growing crops, by reason of said operations; and further to complete one well on said premises within one year, or the said E. R. Woodyard, shall pay to said Jacob S. Swisher rental as hereinbefore provided. The consideration upon which this lease is executed is as follows: Fifty *dollars* cash in hand paid, the receipt of which is hereby acknowledged, and fifty cents per acre for each year that this lease may remain in force after the first year, but it is agreed and understood that the fifty dollars paid in cash is to pay all rentals on this lease for the period of one year from the date hereof; it is further agreed that when the first well is completed on said premises, then all cash rentals shall cease." Clearly it only means to make certain the cessation of any obligation to pay rent after the completion of one well. If the word "and" be inserted between the words "hereof" and "it," it supplies what has clearly been omitted by mere inadvertance, the link which connects this clause directly with the covenant to pay rent, and makes it qualify that clause. The covenant to pay rent itself is conditional by its very terms. The lessee agrees "to complete one well on said premises within one year, *or*" pay rent as thereafter provided. The provision referred to is that he shall pay fifty cents per acre for each year that the lease should remain in force after the first year. This being qualified by the clause providing for the cessation of cash rentals, it simply means that the rent shall be paid for each year that the lease may remain in force after the first year but no longer than the completion of the first well on the premises. This makes it harmonize with the undertaking to complete one well on the premises within one year, or in lieu of completing a well within the year, pay rent. This construction not only harmonizes with the true meaning and purport of the entire provision concerning rent, and adheres to the very letter of the clause itself, but also embodies and enforces that principle of law so universally announced by the courts, as shown by the authorities hereinbefore cited and quoted, which discourages tying up and rendering unproductive the vast fields of mineral wealth, construes every contract and lease as to both lessor and

lessee so as to best promote production, development and progress, and frowns upon every attempt to evade it as being in contravention of both good morals and public policy.

Under this construction, it may be said that, had the lessees found this well, upon its completion, to be a dry hole, they could not have gone on and drilled another and continued their exploration for oil, without making a new lease or contract. That is a question which neither this Court nor any other has ever been called upon to decide. How far the equitable principles, which the courts apply in all cases involving rights under oil leases, might be applied for the relief of one who is prosecuting his search in good faith and with diligence and at great expense, remains to be seen when such a case shall present itself. Such was not the case of *Steelsmith* v. *Gartlan,* nor is it true of this case. It is by no means conclusive of the question of abandonment that the lessees insisted that their lease was not forfeited, that there were some circumstances which rendered it inconvenient for them to continue the work of exploration, and that Cox made some effort to have the alleged defective title of Swisher perfected. All this is consistent with the intention to continue the work of exploration, but it is equally consistent with the intention merely to endeavor to hold on to the lease without doing any work under it, a thing which the policy of the law does not permit unless the right to do so is absolutely fixed and secured by the terms of the contract, and even then it is not always permitted. In *Huggins* v. *Daley,* 99 Fed. Rep. 606, an illiterate farmer leased his land for the term of five years, and the lease contained this clause: "Provided, however, that a well shall be commenced upon the above described premises within thirty, and completed within ninety, days from the date hereof; and, in case of failure to commence and complete said well as aforesaid, the lessee shall pay to the lessor a forfeiture of fifty dollars." Of this lease the court said: "The proof is clear that he never intended to drill the well within the time stipulated. This proviso was written by the lessee evidently for purposes of deception. He knew that the object of the lessor was to secure diligent search for oil, and he was 'keeping the word of the promise to the ear, and breaking it to the hope'; skillfully turning it into a mere speculative lease, binding the lessor and leaving himself free. It would be unconscionable to hold the lessor bound." These excuses and pre-

tenses of the lessees must be taken in connection with the other facts disclosed by the evidence, in determining whether they had laid aside their purpose to go on in good faith and diligence to develop that land and were simply making such pretense of preparation so to do as would enable them to say that they still entertained such purpose, or were actually using diligence and doing what it was reasonably and fairly in their power to do to render the lease productive. Having drilled a well which, according to their own representation, would have produced oil in paying quantities, if protected, they allowed it to fill up and become absolutely worthless, according to the uncontradicted testimony in this case. This undoubtedly shows an abandonment of the purpose expressed by Mobley to drill other wells to be connected with this one and all operated by the same power. It is further shown by the fact that Pearson, whom he intended to employ to do the work, was never requested to begin it, but was allowed to move his machinery away, leaving nothing except a mere hole in the ground to indicate that anything had been done upon the premises. While a lack of water may have delayed the work of cleaning out the well, putting in the tubing and pumping it, no attempt is made to show any reason for the failure to put in sufficient casing and otherwise protect the well from caving in and becoming filled up with obstructions. After leaving the premises in the fall of 1898, Mobley never returned. Cox never came upon the land nor sent anybody else to it until in April, 1900, very nearly the date on which the lease executed to Bell was recorded. At that time, development and exploration for oil, which had not been active in that community for some time, were resumed and there was considerable excitement. These circumstances, no doubt, had much to do with the effort on the part of Cox to resume work on the lease. But that effort came long after the time when they should have been at work on the land or doing something to evidence a purpose to develop it, and long after the occurrences which conclusively show an intent on their part to abandon the lease. The theory, that the lessees, for a long time after the completion of the well, had no intention to go on with the work but were simply trying to hold the lease without doing anything under it, finds strong support in the meaning which they put upon the lease. Under their misconception of it, they claimed the right to hold it and take their own time in which to develop the land.

Prompt and vigorous work on a new well after abandoning the one put down, being in possession of the premises under a lease which, by its own terms, had no binding force upon either party after the completion of one well, might have entitled them to stand upon the equity of the case, but certainly they are not entitled to do so after having delayed action for more than eighteen months, under circumstances which strongly indicate an intention to indefinitely abandon further work on the premises.

These views result in the affirmance of the decree.

*Affirmed.*