A. M. McCOLL, ET AL., Appellees, v. BEAR CREEK COAL MINING COMPANY, ET AL., Appellants.

**Mines and mining:** LEASE: ORAL EVIDENCE: VARIANCE OF WRITING.
1    Where a mining lease failed to specify any time for developing the mine or the diligence with which the work should be carried on after the mine was developed, farther than that the work of development should commence within a specified time from the date of the contract, oral evidence of statements of the lessee during negotiations leading to the making of the lease that work would begin as soon as machinery was obtained did not vary the terms of the writing, and was competent for the purpose of showing the inducement for the execution of the lease and the cancellation of a former one, and what was contemplated by the parties when the lease was entered into.

**Same:** DILIGENCE OF LESSEE.  It is the duty of one leasing property
2    for mining purposes to prosecute the work with reasonable diligence, and failure to do so is ground for forfeiture; and even though the lease as in this case provided that if the lessee elected to mine the coal he should do so within twenty-five years such provision did not give them that length of time to commence work.

**Same:** ABANDONMENT OF LEASE: EVIDENCE.  In this action the evi-
3    dence is reviewed and held to support the finding of the trial court,

that after testing the premises and believing it was not valuable for mining purposes the lessee voluntarily abandoned the lease.

**Same.** Although a mining lease provides that it may be terminated for certain reasons stated therein, the lessee may also lose his rights therein by abandonment of his contract obligations to his lessor.

**Same:** RIGHTS OF LESSEE: ABANDONMENT: LIMITATIONS. A lease of coal land giving to the lessee the right to explore and mine coal if found in paying quantities does not create a vested right in the coal, to the extent that the lessee's right may not be abandoned before expiration of the statutory period barring the right of recovery of real property; and the fact that the lessee had expended money in exploring for coal did not raise such an equity in his favor as to prevent his losing his rights under the lease by abandonment.

**Same:** CANCELLATION OF LEASE: REMEDY AT LAW. The provision of a mining lease giving to the lessor certain royalties does not create such an adequate remedy in damages as to prevent his cancellation of the lease and removal of the cloud created upon his property thereby, on the ground of abandonment.

*Appeal from Dallas District Court.*—HON. L. N. HAYES, Judge.

THURSDAY, OCTOBER 23, 1913.

SUIT in equity to cancel a mining lease because of the alleged abandonment thereof, and to quiet title. Decree for plaintiffs. Defendant the Beaver Creek Coal Company appeals.—*Affirmed.*

*Halloran & Starkey,* for appellants.

*White & Clarke,* for appellees.

PRESTON, J.—This action was commenced August 24, 1911. Plaintiffs owned eighty acres of land described in the contract. On June 11, 1908, they entered into a written coal contract in reference thereto, which all parties seem to have treated as superseded by another similar contract dated May

22, 1909. The terms of the two are similar, except that in the second the royalty to be paid by the coal company was reduced, as some witnesses say, because of difficulty expected in sinking a shaft and mining coal; others say because lessors could get their money for royalty quicker and they would rather have less royalty and get the money than wait several years. It was claimed that under the first contract the lessee had twenty-five years to devolop the mine. The second contract contained a clause that work on development should commence within ninety days from the date of the contract. This lease was between plaintiffs and the Bear Creek Coal Mining Company, and was assigned by said company to the Beaver Creek Coal Company August 13, 1909. It was to run twenty-five years, unless sooner terminated. It contains the provisions hereinafter stated among others. The royalty is fixed and the time of payment thereof, and then reads:

But the liability of said second party (the lessee) hereunder shall cease upon the termination of this lease by forfeiture or otherwise. (It also provides:) 2. The party of the second part shall have the right, within two (2) years from the date hereof, to enter upon said premises and drill and sink such prospect holes as to him may seem sufficient to determine the quality and quantity of coal underlying said premises and if coal or other minerals are not thus found to warrant, in his opinion, the mining and removing the same, then this contract shall cease and terminate, at the end of the two years, unless the party of the second part shall notify party of the first part of his election to continue. The party of the second part, his heirs, successors and assigns shall not be liable for any damages whatsoever to said property occasioned by such prospecting and mining and removing of said coal or mineral. 12. The party of the second part, his heirs, successors and assigns, may at any time after two (2) years from the date hereof terminate this contract by notice in writing if coal cannot be mined at a profit or advantage.

Some prospecting had been done before either lease had been executed, and prospecting was done on plaintiff's land

and on some other lands in the neighborhood, also leased by the same lessees under like contracts, both before and after the first lease. It is claimed, and there is evidence tending to show, that when the second lease was executed the difficulties in the way of sinking a shaft and mining coal, because of drift sand and water, were known to both parties to the contract, and that these difficulties were discussed.

I.   Plaintiffs offered parol evidence, which was received subject to objection, as to certain statements by the lessees during the negotiations for the new lease, and at the time of its execution, that they would commence developing the mine on plaintiff's land as quick as they got the machinery there, and would prosecute the work after it began and take out coal; that, if they took the contract, they could develop the coal field at once; that, if they did not take this contract, they could not develop the field at once. The objection to this evidence was that it was incompetent and tended to vary the terms of the written contract. The writing did not specify any time for developing the mine or the diligence with which mining should be carried on after it was developed, further than the provision that work on development should commence within ninety days from the date of the contract. The contract being silent as to how mining should be carried on after it was developed, and when coal should be taken out, the evidence did not vary any of the terms of the writing. 1 Greenleaf, Evidence Section 277; 1 Elliott on Evidence Section 603; *Bobzin v. Gould,* 140 Iowa, 744; *Dietrich v. Stebbins,* 100 Iowa, 426; *Meader v. Allen,* 110 Iowa, 591; *Merriam v. United States,* 107 U. S. 441, (2 Sup. Ct. 536, 27 L. Ed. 531). And we think the evidence was competent on the question of inducement to the execution of the second contract and the surrender of the first one, and to show what was contemplated by the parties when the lease was entered into. See cases above cited.

This evidence was denied by some of the witnesses for

1. MINES AND MINING: lease: oral evidence: variance of writing.

defendant. The president of the Beaver Creek Company testified: "I was not awful anxious to begin work within ninety days, but was anxious to satisfy Mr. McColl. He wanted to know when we could begin work. He asked me when I could start, and I asked him if we could buy the lumber from him if he thought that he could compete, and he said he could. Then I said that we could begin within ninety days. I do not know whether he wanted us to begin or not sooner, but to commence as soon as we could practically, and he was quite urgent about the beginning of this work, so that they might be sure that efforts were being made to open the mine. Mr. McColl wanted the coal mined and we wanted the coal mined. We had to get the coal in order to get our money back for sinking shaft. It would be to interest of all parties to get the mine opened up." He was present during some of the negotiations between plaintiffs and the original lessees, and when the contract was signed.

II. The evidence just referred to is not very important perhaps, because it was the duty of lessee to prosecute the work with reasonable diligence, and a failure to do so is ground of forfeiture. *Price v. Black,* 126 Iowa, 304; *Worrall v. Wilson,* 101 Iowa, 476; *Hosford v. Metcalf,* 113 Iowa, 245; *Woodward et al. v. Mitchell et al.,* 140 Ind. 406 (39 N. E. 437); 27 Cyc. page 708; *Gadbury v. Ohio, etc.,* 162 Ind. 9 (67 N. E. 261, 62 L. R. A. 895); *Hawkins v. Pepper,* 117 N. C. 407 (23 S. E. 434); *Conrad v. Morehead,* 89 N. C. 31; *Petroleum Co. v. Coal, etc., Co.,* 89 Tenn. 381 (18 S. W. 65); *Parish Fork Oil Co. v. Bridgewater,* 51 W. Va. 583 (42 S. E. 655, 59 L. R. A. 566); *Eaton v. Alleghany, etc.,* 122 N. Y. 416 (25 N. E. 981); *Calhoon v. Neely,* 201 Pa. 97 (50 Atl. 967); *Venture Oil Co. v. Fretts,* 152 Pa. 451 (25 Atl. 732); *Logan Natural Gas Co. v. Great Southern Gas Co.,* 126 Fed. 623 (61 C. C. A. 359); *Foster v. Elk Fork Oil Co.,* 90 Fed. 178 (32 C. C. A. 560); *Aye v. Philadelphia Co.,* 193 Pa. 451 (44 Atl. 555, 74 Am. St. Rep. 698).

2. SAME: diligence of lessee.

This last case is similar to this in some of its aspects. The lease in that case provided for the putting down of a test oil well and for what should be done if it produced oil in paying quantities. The court says: "But the other contingency, that it prove dry, is not provided for, and it is the omitted case that has occurred. The authorities are uniform that under such circumstances there is an implied obligation on the lessee to proceed with the exploration and development of the land, with reasonable diligence, according to the usual course of business, and a failure to do so amounts to an abandonment which will sustain a re-entry by the lessor." In the case at bar, while the lease contemplated the prospecting for coal and mining it if found in paying quantities, it did not contemplate that the mining of the coal would be found under existing conditions to be absolutely impracticable and, that event having occurred, this case is brought within the principle of the case just referred to. The contract does provide that if the lessee, or its assigns, shall elect to mine and remove the coal, they shall do so within twenty-five years, but this does not give them twenty-five years to commence removing it.

III. It is claimed by the plaintiffs that it has never been determined whether coal can be mined at a profit or advantage, no attempt having been made to mine coal, and more than two years has expired; that no continuous work of development has ever been commenced and prosecuted on plaintiffs' land; that defendant Beaver Creek Coal Company did enter upon the work of sinking a shaft upon said land, but after sinking it about sixty feet entirely abandoned the same, and has not further prosecuted said work for a period of two years; that by reason of the premises it has abandoned and forfeited all rights under the contract.

3. SAME: abandonment of lease: evidence.

The paramount issue in the case is whether there has been an abandonment. The evidence in the case was directed largely to this point. The evidence is substantially this, as shown by the different witnesses:

Defendant removed its machinery, some of the lumber, and other things about October, 1909, and has done nothing on the land since that time. No attempt has been made since that time to mine coal or carry on coal mining operations on this land. Some of the houses have been blown down and scattered around the ground and are still there. There is no evidence of operation on the land. The wreck and débris are all there, cinders, pipes, 2x4's, and boards scattered over the two or three acres, besides the dirt that was taken from the shaft.

Plaintiff A. M. McColl, who transacted substantially all the business for plaintiffs, testified as a witness that he had one or two conversations with the president of the Beaver Creek Company after the material was removed; that the plaintiff asked the president if they were going to do anything on the land, and the president said it was not worth doing anything on, and said he would release it, and testifies as to another conversation with the same party, who said that he did not consider they would ever develop; and that they were willing to give up their right in it. McColl then prepared a release and sent it to the president of the company, but it was never signed.

The president of the company denies the substance of this conversation, but admits there was a conversation on that subject, and says he did not come right out and say to McColl that he would not release it, but says he did not tell him that he would. There was a conflict in the evidence on this point for the trial court to pass upon; he being in a position to see and hear the witnesses. This is true as to some other disputed point.

Nearly two years after the machinery and material were removed from plaintiff's land, the appellant wrote the following letter to one of the plaintiffs: "Beaver Creek Coal Co. Des Moines, Iowa, June 22, '11. A. M. McColl, Woodward, Iowa—Dear Sir: Replying to your letter of June 15th addressed to E. C. Smith, would say that this company in-

tends to sink the shaft that we started at Moran if we can find any process for doing so that is reasonably sure and which can be used at an expense that is not prohibitive. We are at the present time investigating the cement process as used in the French mines and also watching the compressed air process which is now being tried in the sinking of a shaft through sand at Norwoodville just north of Des Moines. Please excuse delay in answering your letter. Yours truly, Beaver Creek Coal Co., by E. C. Smith, Prest.''

The engineer in charge of the work of sinking the shaft, while at such work, expressed a doubt as to the possibility of getting down to the coal because of sand and water.

Another witness testified that after defendant quit work they tried to find more drill holes, or prospect some more drill holes, and see if they could not find a place where there was not so much water and sand. This was after they had quit work on the shaft. This was done on some of the neighboring land and not on the plaintiffs'. And after this they moved the machinery away. He thinks the machinery was moved the latter part of the winter, or towards spring, and they have not been back on the land since.

Witness Moran testified to a conversation with Mr. Smith, president of the defendant company, in regard to his reason for not canceling plaintiffs' lease, and says that Mr. Smith agreed to return the lease of this witness, but said he did not feel he could do that with McColl's because Mr. McColl would not help him defeat a bill in the Legislature.

The machinery was not all taken away. They left some old pumps there, as one witness says, and they were lying on the ground where they left them, upside down. Another witness says the stuff they shipped away was a boiler, pumps, and lumber. The boiler they shipped was the one they used in putting down the shaft. They did not have more than one boiler. At one time during the work pumps were changed and defendant got new pumps. The cribbing was not taken out of the shaft. The hoisting engine was removed with the

other things.   The men were laid off, and pumping work was done for about five days after that, and there was no further work of sinking the shaft on account of the water.   The shaft was about half full of water when they quit work.

Mr. Smith, the president of the Beaver Creek Coal Company, testified, in substance, that the work which was done on plaintiff's land was done by the said company after the assignment of the lease to it August 13, 1909; that they drilled several holes to determine the best spot to sink the shaft; that they did not get through the drift sand and water to solid slate; that it was one hundred and thirty feet to the solid, eighty feet of clay and drift and then fifty feet of sand; that they got down fifty-seven feet; that during the work they shut down two weeks to get larger pumps.   He says the shaft could not be sunk by usual methods; that while they were sinking the shaft at one time the water came in so fast that the men had to climb the cribbing to get out; that they could not wait for the tub at that time, in spite of the fact that the pumps were working all the time, and he says, "That simply demonstrated to us that the shaft could not be sunk and it was just a waste of money to try to sink it in the ordinary method."   He says that he sunk a shaft at Ogden through twelve feet of sand, where they proved that was the absolute limit by the ordinary way of sinking to get through.   He continues:

We were for a week—we didn't know whether we had a shaft or had it lost, and we got through with the crooked shaft, and I watched the Norwood mines where they lost two shafts and they had made a contract with the compressed air firm, and they lost one shaft, and the compressed air firm went to the solid, and we thought they had the solution, and, when we asked the Norwood people the cause of their failure, it was found that the compressed air people had failed; we found that in getting down they had allowed so much of the sand to run in to be pumped out that the shaft caved in on them, so that wasn't good.   The Norwood people are going to try again.   I think that it is the same firm.   I tried, from

a representation made, to make a contract with an Omaha firm to freeze it. They agreed to put the shaft down to the solid under the freezing process; my recollection is for $10,000 cash for the first 130 feet, not get down, not get any pay. I instructed the representative to say that if we could make a contract with them on that basis we would. They agreed to do it, agreed to put the shaft down; but he wanted me to guarantee that that was still water. In other words, they said if it is still water we can freeze it; if it is running water we cannot, and I could not guarantee it, for we have no way of knowing that that is not running water, and we have no knowledge of it, so we could not give them the guarantee on that part. I have suggested the cement process and have had long talks with Carl Shotes of the Rock Island Company in building the mines in the southern part of the state. He is an expert on sinking, and I asked him to suggest to me any method by which we could fix that shaft at a cost that was not prohibitive. His suggestion is what is known by the coal mine operators as the 'French process.' He claimed that he saw it used in France. So far they have not tried it here, and I have not been able to find anybody that could do that work in this country. I guess that is all that I have done, excepting to read about every shaft that is being sunk, that I can find out about. The Beaver Creek Coal Company will sink the shaft and start the shaft at any time that we can find a method that we believe can put the shaft down at a cost that is not absolutely prohibitive or more than the value of the field.

When asked as to whether his company intended to abandon the lease, his answer was: "No, sir, we certainly would not abandon $15,000 if we could get it back. The only question, that is, we do not want to spend $15,000 more and not get it back." He also said that he did not know when the company would go on in an attempt to sink the shaft. He says that he does not know just how much money was spent, but he thinks a little over $7,000 was paid by the Bear Creek Coal Company and his company, some of it before and some of it after the contract. He says that nothing has been done since the material was shipped away some time about November.

Some of the witnesses testify that the work was going on about thirty or forty days of actual work. Mr. Smith thinks about five months, but includes in that the surveys and other preliminary work. He also testifies that they prospected the field to see if they could reach plaintiffs' land through some other avenue. At about a mile from plaintiffs' land they found a place where the solid came within ten or twelve feet of the top, but they would have to drive through 1,500 or 1,600 feet of sand rock. This witness also testifies in an indefinite manner as to a notice which he says was served on Mr. McColl, but we are unable to say from the record whether he claims the notice was to continue or to terminate the contract as provided in the portions thereof heretofore quoted. No such written notice is contained in the record.

There was no work done on plaintiffs' land of any kind after about October, 1909. There is no dispute as to this. The defendant may have done all that it could do under methods now known to reach this coal. In our opinion, the defendant became satisfied that it could not reach the coal, and that this is a reason why they did abandon the contract. Whether defendant abandoned the contract and its rights thereunder is a question of fact. There was a conflict in the evidence at some places. From all the facts and circumstances shown by the evidence, we are satisfied with the finding of the trial court that, after testing the premises to its satisfaction and believing the same were of no value to it, defendant did in fact voluntarily abandon the lease and the rights under it, and that it intended to do so. The president of the company says they did not intend to abandon, but this is not conclusive. 27 Cyc. 598. The intent must be determined from all the facts and circumstances shown.

Under such a contract the lessee may lose its rights thereunder by abandonment. *Price v. Black*, 126 Iowa, 304, 306, and cases; *Eaton v. Gas Co.*, 122 N. Y. 416 (25 N. E. 981); *Parish Fork Oil Co. v. Bridgewater*, 51 W. Va. 583 (42 S. E. 655, 59 L. R. A. 566); *Smith v. Root*, 66 W. Va. 633 (66 S. E. 1005, 30 L. R. A. (N.

4. Same.

S.) 176) ; *Eastern Oil Co. v. Coulehan,* 65 W. Va. 531 (64 S.
E. 836) ; *Beatty v. Smethers,* 49 Ind. App. 602 (96 N. E. 19) ;
*Harris v. Michiael,* 70 W. Va. 356 (73 S. E. 934) ;
*Charleston Mining Co. v. American Co.* (Tenn.) 150 S. W.
1143; 27 Cyc. 739, 740; 1 Am. & Eng. Enc. of Law (2d Ed.)
1.  Abandonment may arise from a single act or from a series
of acts.  27 Cyc. 597.  The evidence tends to show that there
was a workable vein of coal on this land.  The lease may be
terminated, according to its terms, for certain reasons, and
the method is prescribed.  But it could be abandoned for
other reasons.  Even though there was coal in paying quan-
tities, if defendants were satisfied that it could not be reached,
or mined if reached, they could abandon it for this or any
other cause, subject to. its contract obligations to the lessor
under the lease.

IV.  It is said by appellant that the lease vested in de-
fendant the title to the coal under the land, which constitutes
an interest in real estate, and that there may not be an aband-
onment unless the statutory period barring the
5.  SAME: rights    rights of recovery of real estate has run.  It
of lessee :
abandonment:   has been held that a vested title may not, ordi-
limitations.
narily, be lost by abandonment in a less time
than that fixed in the statute of limitations.  Other courts have
held that there may not be an abandonment of legal title to real
estate unless the circumstances of the case are sufficient to
raise an estoppel, or where possession has been acquired by
another in consequence of the abandonment and held for the
statutory period of limitations.  Still other cases hold that
there may be an abandonment of real estate, as well as of a
chattel.  1 Am. & Eng. Enc. Law, 2 and 3, and cases.

However this may be, we are of the opinion that under
the facts of this case it would be more accurate to say there
was · an abandonment of the lease and the lessee's rights
thereunder.  We are of the opinion that it was not the pur-
pose or intention to convey such title or interest in land as
contended by appellant, and the contract should not be so

construed.   The contract gives the rights of exploration and to mine coal if found in paying quantities, upon certain conditions.   Suppose there had been but one foot of coal, and defendant had been of opinion that it was not a paying quantity, and defendant had notified plaintiffs, under the provisions of the lease, that it elected to terminate the contract because coal could not be mined at a profit or advantage, could it be claimed that defendant owned absolutely the one foot of coal in place?   Or, even though there was coal in a workable quantity and defendant had notified plaintiff that the lease was terminated, could it be claimed that defendant had any ownership or interest in the coal?   We think not.

"What the lessee acquires by discovery is the right to produce and take the oil, paying out of it the stipulated royalty, and not title to the oil as it remains in the land without production." *Parish Fork Oil Co. v. Bridgewater Gas Co.*, 51 W. Va. 583 (42 S. E. 655, 59 L. R. A. 566, at 570). That was an oil lease, it is true; but in speaking of such a contract the court said: "After the discovery of oil in paying quantities, it is held that title does vest in the lessee; but there is no case which goes so far as to announce that after mere discovery of oil, the lessee, upon the assumption of a vested interest or title, may cease operation, refuse to develop the property, tie up the oil by his lease, and simply hold it for speculative purposes, or to await his own pleasure as to the time of development.   A well-settled principle of law is that a contract shall be construed as a whole and in the light of the purposes and objects for the accomplishment of which it was made.   Oil leases are no exception to the rule, and, as the subject-matter of the lease is peculiar in its nature, the courts have given this principle great latitude in their construction.   They are executed by the lessor in the hope and with an expressed or implied condition that the land shall be developed and oil produced.   When production takes place, the lease is mutually beneficial.   The royalty, which it is stipulated in all these leases that the landowner

shall receive, is generally the moving cause of the execution of the lease. If there is one principle that is asserted in *Steelsmith v. Gartlan,* 45 W. Va. 27 (29 S. E. 978, 44 L. R. A. 107), more vigorously, and with more emphasis, than any other, it is that the lessee shall proceed to make the lease profitable to both parties and that he shall not be permitted to tie up the land. The 'testing' provided for was manifestly a condition upon which the lease depended. If such test showed no minerals, then the contract was at an end; if it, on the other hand, showed the presence of valuable mines, then the lessees were bound to operate them in good faith for the joint profit of themselves and the owners of the fee.'' The same case quotes from a North Carolina case as follows: ''It would be unjust and unreasonable, and contravene the nature and spirit of the lease, to allow the lessee to continue to hold his term a considerable length of time, without making any effort at all to mine for gold or other metals. Such a construction of the rights of the parties would enable him to prevent the lessor from getting his tolls under the express covenant to pay the same, and deprive him of all opportunity to work the mine himself, or permit others to do so. The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice.'' See, also, *Smith v. Root, supra.*

In so far as this feature is concerned, it seems the same rule applies whether the mineral be oil, coal, or other mineral. It may be, as suggested by appellant, that there is a distinction between a coal lease and a lease for oil and gas, because the latter substance may be drained from the property ower's land by an adjacent well, thereby making greater diligence necessary than would be required for coal; but this would only go to the question of diligence and reasonable time.

V. Some other questions will be referred to briefly.

We think the question of rescission is not in the case nor is the statute of limitations in the case. Appellees have not

asked a rescission of the contract.    Since the abandonment by defendant, plaintiffs have accepted the situation and asked the removal of the cloud upon their title created by the lease. The distinction between forfeiture and abandonment is that, unlike abandonment, there is no question of intent involved in forfeiture.    In forfeiture the question is whether the contract or law has been complied with.    This question has been argued to some extent, but counsel for appellees state in argument that they rely on abandonment.    Some of the cases we have cited refer to abandonment as a forfeiture.

We fail to see how any equity is raised in favor of defendant because it expended money in prospecting and attempting to reach the coal.    It is unfortunate for both plaintiffs and defendant that the coal cannot be reached. Defendant simply concluded it would be better to abandon what they had done rather than to make further expenditures. The difficulties were known, at least to some extent, before the contract was made or the work on the shaft commenced.

VI.    Lastly, it is urged by appellant that plaintiffs have a plain, speedy, and adequate remedy at law for damages. The contrct provides.    "All land over one-half mile from shaft shall have a guaranty royalty of $1.00 per acre; over three-fourths mile, $2.00 per acre; and over one mile, $3.00 per acre, annually, after two years."    There would be but little, if any, of plaintiff's land subject to this royalty, for the reason that but eighty acres were leased by them.    It is doubtless true that defendant could not abandon the lease without the consent of plaintiffs and escape payment of such an obligation, if insisted upon.    The small compensation, if any, payable under this provision, would not be an adequate remedy for tying up the entire eighty acres for an indefinite period. Having abandoned the contract, which has now been accepted by plaintiffs, the lease creates a cloud upon plaintiffs' title, which they are entitled to have removed and to have the lease canceled.    27 Cyc. 733, 734; *Eastern Oil Co. v. Coulehan,* 65

6. Same: cancellation of lease: remedy at law.

W. Va. 531 (64 S. E. 836); *Beaty v. Smethers,* 49 Ind. App. 602 (96 N. E. 19); *Smith v. Root, supra; Blair v. Hemphill,* 111 Iowa, 226; *Cranston v. McQuiston,* 127 Iowa, 104.

The decree of the district court was right, and it is *Affirmed.*

WEAVER, C. J., and LADD and EVANS, JJ., concur.