CARTER et al. v. CERTAIN–TEED
PRODUCTS CORP.
Civ. No. 508.

United States District Court
N. D. Iowa, Central Division.

Jan. 30, 1952.

Alan Loth, Fort Dodge, Iowa, for plaintiffs.

A. B. Howland, Des Moines, Iowa, Norman A. Miller, Chicago, Ill., for defendant.

GRAVEN, District Judge.

The defendant Certain-Teed Products Corporation is a corporation organized and existing under the laws of the State of Maryland. Prior to 1948 its general offices were in Chicago, Illinois. Since 1948 its general offices have been at Ardmore, Pennsylvania. It has been and is engaged in the processing and selling of gypsum and gypsum products. For many years it has had a gypsum plant in the near vicinity of Fort Dodge, Iowa.

In the vicinity of the defendant's gypsum plant at Fort Dodge there is an 80 acre tract of land described as the South Half of the Northwest Quarter of Section Twenty-six, Township Eighty-nine North, Range Twenty-eight West of the Fifth Principal Meridian, Webster County, Iowa.

On August 22d, 1945, the ownership of such land was as follows: Clara O. Carter,

the wife of the plaintiff William J. Carter, was the owner of an undivided ⅜ths interest; Maurice J. Breen, individually, owned an undivided ⁴⁄₁₀ths interest; William O. Merritt, Harriett Merritt Stevens, Ben Merritt and Doris O. Merritt were each the owners of an undivided ⁵⁄₁₀ths interest therein. Clara O. Carter subsequently died and William J. Carter as her sole devisee and as the executor of her will succeeded to her interest therein. Maurice J. Breen, as Trustee under the will of one W. N. Merritt, deceased, holds title to the interests of William O. Merritt, Harriett Merritt Stevens, Ben Merritt and Doris O. Merritt therein. The trusteeship is under the jurisdiction of the District Court of Iowa in and for Webster County. The plaintiffs William J. Carter and Maurice J. Breen are citizens of the State of Iowa. Some of the other plaintiffs are citizens of the State of Iowa and the balance are citizens of the State of California. The plaintiff Gretchen Merritt is the wife of the plaintiff William O. Merritt. The plaintiff Halsen Stevens is the husband of the plaintiff Harriett Merritt Stevens.

On August 22d, 1945, William J. Carter and Maurice J. Breen, as representatives of the owners of the tract referred to, and the defendant entered into an option agreement relating thereto, and on September 24th, 1945, the owners of the tract and the defendant entered into another agreement relating thereto. A substantial portion of the tract is underlaid with gypsum rock and the agreements referred to had to do with the extraction of that rock. On October 22d, 1951, the plaintiffs commenced this action. In their complaint they ask for a declaration of their rights under the agreement of September 24th, 1945, under the provisions of the Federal Declaratory Judgments Act, 28 U.S.C.A. §§ 2201 and 2202. They also ask recovery of damages and other coercive relief. Jurisdiction is based upon diversity of citizenship. The amount in controversy in this case, exclusive of interest and costs, is in excess of $3,000.00.

The parties are in agreement that Iowa law is applicable.

Gypsum rock has an interesting history, unique characteristics, and manifold uses. It is commonly known as plaster rock. It is known to chemists as calcium sulphate. Its geological origin is not certain. It has been termed the "rock nobody knows,"[1] Gypsum has been in use for thousands of years. It was used in the pyramids of Egypt. It is referred to in the ancient cuneiform script of the Assyrians. The Greeks used it extensively. Gypsum has thousands of present day uses. In 1950 more than nine million tons of gypsum were used in the United States. Substantial quantities are used in the manufacture of cement and plaster. Its greatest use is in the manufacture of wall board and lath. The processing of gypsum involves heating the rock in large kettles to drive off the water of crystallization and grinding it into a fine powder commonly known as "Plaster of Paris." If water is added to this powder it becomes pliable and can be molded into any shape into which it will set when it dries. Gypsum is the only natural substance known that can be restored to its original rocklike state by the addition of water alone. Gypsum deposits in the United States are found in two principal belts. The first belt starts in southwestern Texas, runs up through central Kansas, across Iowa, into southern Michigan, then turns and runs along the northern edge of Ohio and ends in New York. The second belt starts in the Imperial Valley in California, runs up through Nevada and spreads out into Utah. Gypsum usually occurs in veins or ledges. Fort Dodge, Iowa, is now and for a great many years has been an important gypsum center. At the present time five gypsum plants or mills are located in the vicinity of Fort Dodge.

The tract in question, hereafter referred to as the Carter-Merritt tract, was and is underlaid with a substantial quantity of gypsum rock. The tract is about two miles from the gypsum plant of the defendant

---

1. See article, "The Rock Nobody Knows," 44 Nature Magazine, pp. 538–540 (December, 1951). The greater portion of the information contained in this paragraph was obtained from that article.

known as its Fort Dodge plant. In the month of August, 1945, William J. Carter and Maurice J. Breen, in behalf of the owners of that tract, entered into negotiations with the defendant relative to the removal of gypsum rock. The defendant was represented in the negotiations by Rawson Lizars, its president, and its secretary, Arthur O. Graves. The first result of the negotiations was the execution of an agreement referred to by the parties as the "option agreement." In that option agreement the owners of the Carter-Merritt tract, referred to in the agreement as Lessors, granted and conveyed to the defendant, referred to in the agreement as the Lessee, the right to enter upon the Carter-Merritt tract for a period of forty-five days for the purpose of exploring for gypsum. The option agreement further provided that if within the forty-five day period the defendant notified the Lessors of its desire to mine and quarry gypsum rock on the tract, the Lessors would enter into a lease with respect to such mining and quarrying. The option agreement further states in substance that if the privilege of mining and quarrying is availed of by the Lessee, the Lessee shall have the right to mine or quarry to any extent and in any manner desired and to use the surface of the land. The option agreement further provides: "The Lessee agrees to extract 60% of all of its rock requirements from said property, and agrees to pay to the Lessors, for and on behalf of the owners of said property, 12 cents per ton on all rock mined, and 10 cents per ton on all rock quarried. The weights of the gypsum rock withdrawn from the property is to be calculated on scales either at the plant of the Lessee or at the crushing plant."

The option agreement also contained a provision relative to the matter of advance royalties.

On September 19th, 1945, the defendant notified the owners of the tract of its election to exercise the option given it in the agreement. On or about September 24th, 1945, the parties executed the agreement which is the subject matter of this action. The execution of it by Maurice J. Breen in his capacity of Trustee was approved by the District Court of Iowa for Webster County. The present litigation was occasioned by disagreement between the parties as to the construction of that agreement.

The parties are in controversy as to whether or not the instrument in question is a lease. The Court is of the view that it is a lease. See, Lacey v. Newcomb, 1895, 95 Iowa 287, 63 N.W. 704; Berg v. Commissioner, 1929, 59 App.D.C. 86, 33 F.2d 641; Del Valle v. Rossy, 1 Cir., 1928, 29 F.2d 353.

The lease is dated September 24th, 1945. In it the owners of the Carter-Merritt tract are referred to as the "Lessors" and the defendant is referred to as the "Lessee." The forepart of the agreement contains recitals as to the ownership of the premises and as to the option agreement. The principal controversy between the parties is as to the construction to be placed upon certain language used in Paragraph 10 of the lease. In that connection the plaintiffs in their written briefs and on oral argument stressed certain language used in Paragraphs 6, 7, 10, and 15 thereof. The provisions of the lease, through Paragraph 15, are next set forth with the words most stressed in connection with the construction of the lease italicized:

"Now, therefore, for and in consideration of the mutual agreements and covenants herein contained, it is agreed by and between Lessors and Lessee, each with the other, as follows:

"1) Lessors, by their signing this agreement, acknowledge and accept the exercise by Lessee of the option given to Lessee in the said agreement as of the date hereof, hereby confirms its exercise of the option granted to it in and by the said agreement dated August 22, 1945.

"2) Lessors hereby lease and demise to Lessee, its successors and assigns, the following decribed real estate and premises situated in Webster County, Iowa: 'The South one-half (½) of the Northwest one-quarter (¼) of Section 26, Township 89 North, Range 28 West of the 5th P. M.' and hereby grant and convey to Lessee, its successors and assigns, the exclusive right

and privilege of mining and removing gypsum or plaster rock under, upon or from said real estate and premises to any extent and in any manner desired by Lessee, including the quarrying and removal from said real estate and premises of said gypsum or plaster rock, of sinking all necessary and proper shafts and/or slopes, of storing on said real estate and premises any amount of said gypsum or plaster rock when mined or quarried, of occupying and using the surface of said real estate and premises for the full enjoyment of and with the right to conduct such mining or quarrying operations and of laying all necessary switch tracks or connections with railroads and of constructing and maintaining all roads or driveways for transporting and marketing any and all gypsum or plaster rock so mined, and Lessee will mine or quarry said real estate and premises in a workmanlike manner using customary mining or quarrying practices as long as such mining or quarrying can be done on an economical basis.

"3) The lease and demise of said real estate and premises and the exclusive right and privilege of conducting mining or quarrying operations upon or under said real estate and premises shall be for a term of ten (10) years beginning October 6, 1945 with the right granted to Lessee of successive renewals as hereinafter provided.

"4) In consideration for the lease and demise and the rights and privileges hereby made and granted to Lessee by Lessors, and as an advance payment on the royalties or per ton payments to be made by Lessee to Lessors for the gypsum or plaster rock mined or quarried and removed from said real estate and premises by Lessee, as hereinafter provided, Lessee will pay to Lessors or to their successors or assigns, on October 6, 1945, the sum of Twenty-Five Thousand Dollars ($25,000.00) provided this agreement is, on or before said date, duly signed and acknowledged by each and all of the Lessors herein named and if this agreement is not so signed and acknowledged by the Lessors on or before October 6, 1945, then Lessee will pay said sum of Twenty-Five Thousand Dollars on the date after October 6, 1945 when this agreement has been so signed and acknowledged by all of the persons named herein as Lessors, said sum of Twenty-Five Thousand Dollars ($25,000.00) in either event to be paid by Lessee as follows:

"(a) Ten Thousand Dollars ($10,000.00) in lawful money of the United States of America or by certified or uncertified check to Maurice J. Breen, as Trustee under the Will of W. N. Merritt, deceased, or to his successors or assigns, which payment shall be credited upon and deducted from the royalty or per ton payments herein provided for upon commencement of the mining or quarrying and removing of said gypsum or plaster rock; and

"(b) Fifteen Thousand Dollars ($15,000.00) in lawful money of the United States of America or by certified or uncertified check to Clara O. Carter, or to her successors or assigns, of which amount the sum of Nine Thousand Dollars ($9000.00) is to be paid to the said Clara O. Carter, or her successors or assigns, on October 6, 1945, or on the date thereafter when this agreement has been signed and acknowledged by all of the persons named herein as Lessors, as herein provided, the sum of Three Thousand Dollars ($3000.00) is to be paid to the said Clara O. Carter, or to her successors or assigns, one (1) year from the date of the payment to her of the said sum of Nine Thousand Dollars ($9,000.00) and the remaining Three Thousand ($3,000.00) to be paid to the said Clara O. Carter, or to her successors and assigns, two (2) years from the date of the payment to her of the said sum of Nine Thousand Dollars ($9,000.00), all of said payments to the said Clara O. Carter, or to her successors or assigns, to be credited upon and deducted from the royalty or per ton payments herein provided for upon commencement of the mining or quarrying and removing of said gypsum or plaster rock.

"5) Lessee will pay Lessors, or their successors or assigns, in lawful money of the United States of America or by certified or uncertified check, a royalty of ten ($0.10) cents for every ton of 2,000# of

gypsum or plaster rock that shall be quarried and removed from the said real estate and premises covered by this agreement and a royalty of twelve (0.12) cents for every ton of 2,000# of gypsum or plaster rock that shall be mined by underground mining operations and removed from the said real estate and premises covered by this agreement. The sum of Twenty-Five Thousand Dollars ($25,000.-00) paid or to be paid by Lessee to Lessors as provided for in paragraph 4) above shall be credited against the royalty payments provided for in this paragraph irrespective of whether said royalty payments are earned in the same year or years as the said sum of Twenty-Five Thousand Dollars ($25,000.00) or any part or portion thereof is paid by the Lessee to the Lessors as herein provided, it being the intention of the Lessors and the Lessee that no royalties or per ton payments due pursuant to the provisions of this paragraph shall be paid by the Lessee to the Lessors until royalty or per ton payments in excess of Twenty-Five Thousand Dollars ($25,000.-00) computed on the basis set forth in this paragraph, have been earned.

"6) All royalty payments specified in Paragraph 5) shall be made on or before the 15th day *of each month during the term of this agreement* or any renewal or renewals thereof and shall be based upon the quantity of gypsum or plaster rock quarried or mined and removed *during the previous period of one (1) month*. Such royalty payments shall be paid on the basis of three-fifths (⅗) thereof to Clara O. Carter and William J. Carter, her husband, and the remaining two-fifths (⅖) thereof to Maurice J. Breen, as Trustee under the will of W. N. Merritt, deceased, or to their respective successors or assigns.

"7) In order to determine the amount of said royalty or per ton payments as specified above, all gypsum or plaster rock mined or quarried and removed shall be weighed at the plant of the Lessee in Fort Dodge, Iowa, at the crushing plant of Lessee on or near the leased premises or at the shaft of Lessee on standard scales or conveyor weigh meters and a just and detailed account thereof, indicating whether said gypsum or plaster rock has been mined or quarried shall be kept and furnished to Lessors, or their successors or assigns, at their request *at any and all reasonable times* and Lessors, or their successors assigns, may have access to the maps and weight books of Lessee for the purpose of verifying such weights and to the production records of Lessee to determine whether at least sixty percent (60%) of Lessee's gypsum and plaster rock requirements, as hereinafter set forth, *are being extracted* from said real estate and premises.

"8) The rights hereby granted to Lessee, its successors and assigns, shall be deemed to include the right to establish and maintain such haulageways either above or below ground as Lessee deems desirable for the purpose of conducting its mining or quarrying operations on the leased premises, for the purpose of branching to and transporting through or over said haulageways other gypsum or plaster rock mined or quarried from any other lands or to use any shafts or quarrying pits in connection therewith and for any other uses and purposes necessary or convenient in connection with Lessee's mining or quarrying operations before, during and after the mining, quarrying and removal of the gypsum or plaster rock from the real estate and premises of Lessors.

"9) The rights hereby granted to Lessee, its successors and assigns, shall be deemed to include the right to lessee to erect and maintain upon or beneath the surface of said real estate and premises all hoisting shafts, air shafts, slopes, spoils banks, rock storage and other facilities, including shops and buildings, for as long as this agreement and lease or any extension, renewal or continuation thereof, shall be in force and effect. All buildings or improvements erected and maintained on said real estate and premises and all equipment installed upon or beneath said real estate and premises by Lessee shall be deemed to be and remain the personal property of Lessee, its successors and assigns, the Lessors hereby waiving the right to hold any of the property or improvements placed or

erected upon or beneath the said real estate and premises by Lessee. Lessors also agree to indemnify Lessee against any and all acts of the Lessors, their tenants, employees or agents for damage to any property of the Lessee installed, erected and maintained by Lessee upon or under said real estate and premises.

"10) Lessee agrees to begin preliminary mining or quarrying operations on the real estate and premises described herein within ninety (90) days from the date this lease becomes effective and will, as rapidly thereafter as development and conditions permit, and in any event commencing not later than January 1, 1947, *extract not less than sixty per cent (60%) of the gypsum and plaster rock requirements* for the physical establishment constituting Lessee's present gypsum plant in Fort Dodge, Iowa, from said real estate and premises *and will continue to do so* as long as there is sufficient gypsum or plaster rock upon or under said real estate and premises of acceptable quality, in sufficient quantities and economically and profitably obtainable by the then currrent methods of mining or quarrying to supply said sixty percent (60%) of Lessee's said requirements. If, any time after the effective date of this lease, Lessee or its present gypsum plant in Fort Dodge, Iowa is sold, purchased, merged, consolidated, reorganized or assigned to or with any other person, firm or corporation and such successor or assignee fails for a period of eighteen (18) consecutive months after such change in ownership to operate Lessee's present gypsum plant in Fort Dodge, Iowa, then and in such event, Lessors may, at their option, cancel this lease or any renewal or extension thereof upon ninety (90) days written notice of their intention to do so to the successor or assignee of Lessee, unless within such period of ninety (90) days after receiving said notice, said successor or assignee shall resume operation of Lessee's said plant and commence to take not less than sixty percent (60%) of the gypsum or plaster rock requirements thereof from said real estate and premises.

"11) This lease and agreement is to be for a term of ten (10) years from October 6, 1945 with the right granted to Lessee to extend, renew and continue this agreement for successive periods of ten (10) years each thereafter, upon Lessee's giving written notice in the manner herein provided to Lessors of Lessee's election to extend, renew and continue this lease and agreement not less than sixty (60) days before the expiration of the previous ten (10) year term. Lessee is also granted the right to cancel this lease and agreement on December 31st of any year by giving written notice in the manner herein provided of its intention to so terminate this agreement to Lessors, not less than sixty (60) days prior to December 31st in any year.

"12) Lessee will assume and pay all taxes on the improvements installed and maintained by or for Lessee upon said real estate and premises, which improvements it is agreed herein, shall be and remain the personal property of Lessee, and will pay on or before the penalty date in each year the real estate taxes levied and assessed against said real estate and premises each year, and Lessors will permit and allow Lessee to deduct from and credit against the first royalty or per ton payments as herein described due thereafter, the amount of said real estate taxes so paid by Lessee for and on behalf of Lessors. The agreement and obligation of Lessee to pay said real estate taxes is contingent upon the Lessors delivering to Lessee, promptly in each year and in any event before the penalty date all bills for real estate taxes levied and assessed against said real estate and premises and said real estate taxes will be paid by Lessee, for and on behalf of and in the name of the Lessors and provided that the Lessee's agreement and obligation to so pay said real estate taxes shall cease and end at such time as Lessee ceases to mine or quarry and remove gypsum or plaster rock from said real estate and premises, at which time Lessee will notify Lessors in the manner herein provided and thereafter Lessee shall have no further obligation

with reference to the payment of said real estate taxes and said real estate taxes thereafter will be paid by Lessors as they become due.

"13) Lessors agree that they have good title to the said real estate and premises and full and complete right to make this lease and agreement and that they will at all times protect and defend the rights of Lessee hereunder.

"14) Lessors will, on or before October 6, 1945 or on or before such date thereafter as the first payments hereunder are made by Lessee or Lessors, procure through their own efforts and at their own expense, and deliver to Lessee in a form suitable for recording, a statement or other agreement from the holder of any mortgage or lien against the real estate and premises covered by this agreement, subordinating said mortgage or mortgages and the lien created thereby to this agreement and to the rights of the Lessee hereunder, or in lieu thereof, Lessors may, at their election, pay any of said mortgages or other liens and have them released of record.

"15) Lessee, when it commences gypsum mining or quarrying operations, will do so *and continue to do so* in the manner and by the methods usual and customary for gypsum mining or quarrying operations at the times in question. However, it is realized that even though Lessee does so conduct its mining or quarrying operations, the surface of the real estate and premises covered by this agreement will be damaged and Lessors therefore, in consideration of the royalty payments provided for herein, agree to and do hereby release Lessee, its successors and assigns, of and from any claims for damages to themselves or to their property while on the surface of said real estate and premises and do further hereby agree to and do indemnify Lessee against any such loss or damage suffered by persons other than employees, agents or servants of Lessee and other than persons in or on said real estate and premises for the purpose of doing business with the Lessee, or suffered by the property of any such persons, all while lawfully on said real estate and premises."

For a period of several months prior to August 22d, 1945, the defendant had obtained the gypsum needed for its Fort Dodge plant by purchase from the United States Gypsum Company. Prior to that period the defendant had obtained such gypsum by mining operations conducted on a tract adjacent to that plant. Its mining operations on that tract were terminated by a cave-in. At the time of the negotiations between the parties and at the time of the execution of the option agreement of August 22d, 1945, and the lease of September 24th, 1945, the defendant did not have quarrying equipment. The gypsum deposit on the Carter-Merritt tract was overlaid with approximately fifty feet of earth. The removal of that overburden and the conducting of quarrying operations on the tract required a heavy type of equipment. Because of the shortages occasioned by World War II, it was difficult to secure such equipment. Following the execution of the agreement of September 24th, 1945, the defendant entered into a contract with Peter Kiewit Sons' Co., a corporation, for the installation of rock crushing facilities, the removal of the overburden and for quarrying a supply of gypsum. That corporation was engaged in the contracting business, apparently on a large scale, and had available the type and kind of equipment that was required. The contractor completed the installation of rock crushing facilities on the tract late in 1945 or early in 1946. That installation was a project of considerable size. By March, 1946, the contractor had completed the removal of the earth overburden in a "cut" on the western portion of the tract. In March, 1946, the contractor commenced extracting the exposed rock. He quarried on a large scale until in September, 1947, when his quarrying operations ceased. During that period he quarried over 450,000 tons of rock. No rock was extracted from October, 1947, through February, 1949. By February, 1949, the defendant had acquired its own quarrying equipment. It extracted rock from the Carter-Merritt tract from March, 1949, through October, 1949. It extracted rock from the Carter-Merritt tract in March, April, June, and

July of 1950 and again from September, 1950, through January, 1951, and again in the months of May, June, July, October, and November, 1951. On September 5th, 1947, the defendant entered into an agreement with the owners of a tract known as the Steiner tract relating to removal of gypsum therefrom. That tract is an 80 acre tract which adjoins the Carter-Merritt tract on the north. In October, 1949, the defendant commenced the extraction of gypsum rock from that tract. Since October, 1949, the defendant has conducted extensive quarrying operations on the Steiner tract. In such operations the defendant has sought to "catch up" with the line to which quarrying had been done on the Carter-Merritt tract. This would enable unified quarrying activities to take place along a straight "front" across the two tracts. The defendant deems that such unified activity would make for safety and economy. In 1949 and 1950 the defendant constructed a new factory building which greatly enlarged its facilities for the manufacture of wall board. That construction, together with other improvements, increased the capacity of its Fort Dodge plant from 80 per cent to 100 per cent. Such increased capacity has resulted in a large increase in its gypsum requirements. The gypsum requirements of the defendant increased from 157,228 tons in 1948 to 180,025 tons in 1950 and to 199,410 tons for the first nine months of 1951. The defendant · sells and ships crushed rock to other processors. Those shipments have averaged around 30,000 tons a year. They have increased from 19,764 tons in 1946 to 43,805 tons for the first nine months of 1951. It is the claim of the defendant that in 1949 and 1950 it expended approximately $2,300,000.00 in expanding its Fort Dodge plant. From March, 1946, to the end of that year the defendant extracted 236,375.9 tons of rock from the Carter-Merritt tract. Its requirements for that period were 122,288 tons. During that period the ratio between the tons extracted from that tract and the defendant's requirements was 192.35 per cent. In 1947 the defendant extracted 228,167.75 tons from that tract. Its re-

quirements for that period were 147,367 tons. During that period the ratio between the tons extracted from that tract and the defendant's requirements was 154.83 per cent. In 1948 it extracted no rock from that tract. During that year its requirements were 157,228 tons. In 1949 the defendant extracted 75,044.7 tons from that tract. Its requirements for that year were 141,067 tons. During that year the ratio between the tons extracted from that tract and the defendant's requirements was 53.18 per cent. In 1950 the defendant extracted 102,942.7 tons from that tract. Its requirements during that period were 180,025 tons. During that period the ratio between the tons extracted from that tract and the defendant's requirements for that year was 57.18 per cent. In 1951 through September the defendant extracted 74,494.8 tons from that tract. Its requirements during that period were 199,410 tons. During that period the ratio between the tons extracted from that tract and the defendant's requirements was 37.48 per cent. From March, 1946, and up until the time this action was started the ratio between the tons of rock extracted by the defendant from that tract and the defendant's requirements was 75+ per cent. The ratio has not been changed materially since the action was commenced. During the period from March, 1946, up to the date this action was commenced a total of about 720,000 tons of gypsum was quarried by defendant from plaintiffs' land, resulting in royalty payments to plaintiffs of about $72,000.00.

In the period from October through December, 1949, the defendant extracted 39,108.65 tons of rock from the *Steiner* tract. In the year 1950 it extracted 88,544.89 tons of rock from that tract. In 1951 it extracted rock from the Steiner tract from January through May and from July through September. During that period it extracted 128,311.79 tons. During the period from March, 1946, up to the present the defendant has not used at its Fort Dodge plant any gypsum rock that did not come from either the Carter-Merritt tract or the Steiner tract. The defendant made timely payment of the advance royal-

ties and of royalties for each month in which rock was extracted from the Carter-Merritt tract.

The defendant has made substantial expenditures in connection with its development and utilization of the Carter-Merritt tract which it classifies as being capital in character. Those expenditures are:

| | |
|---|---|
| Cost of stripping | $ 84,351.39 |
| Crushing plant | 71,158.77 |
| Fixed equipment | 53,851.87 |
| Mobile equipment | 415,071.87 |
| Road building | 5,802.01 |
| Miscellaneous development expense | 8,225.19 |
| | $638,461.10 |

The allocation of some of those items to the Carter-Merritt tract and the amount of all of the items is controverted by the plaintiffs. The allocation of the expense of mobile equipment to the Carter-Merritt tract would not seem to be justified, and a similar allocation of some of the other items is open to question. It does appear that the crushing plant and the fixed equipment are of such a nature that they could not be removed in the event of the termination of the lease.

On September 28th, 1951, the plaintiffs caused a notice of termination of tenancy to be served upon the defendant. In that notice the defendant was notified that its tenancy under the lease dated September 24th, 1945, was terminated because of non-payment of rent. It was stated in the notice that it was being given pursuant to the provisions of Chapter 648, Code of Iowa 1950, I.C.A. That Chapter relates to the matter of the Forcible Entry or Detention of Real Property.

On October 2d, 1951, the plaintiffs filed their complaint herein. They ask that the Court declare the rights and duties of the defendant under the lease of September 24th, 1945, in respect to the 60 per cent requirement; that the Court adjudicate that the defendant has breached the lease by the non-payment of rent due thereunder; that the defendant be removed from the leased premises; that the plaintiffs be restored to possession of it; and

that the plaintiffs recover the amount of rent ascertained to be unpaid.

It is the claim of the plaintiffs that the defendant was obligated by the lease and in particular by the italicized portions of the clauses set forth supra to extract from the Carter-Merritt tract each *month* an amount of gypsum equal to 60 per cent of the total amount used in the defendant's Fort Dodge plant during that *month*. Under this claim of the plaintiffs, the royalties due them would be computed on the following monthly basis: the number of tons of gypsum used by the defendant in its Fort Dodge plant during the month would be ascertained, then the defendant would be obligated to have extracted from the Carter-Merritt tract during that month rock of a tonnage equal to 60 per cent of the tonnage used. The plaintiffs seek to recover for each of 35 or 36 months in which the rock extraction by the defendant was not in accord with that formula. Computed on this basis, the amount of the plaintiffs' recovery (as stated by them in argument) would be between $35,000.00 and $40,000.00. It was similarly stated that if such formula is not to be applied on a monthly basis that it should be applied on an annual basis, and that if applied on an annual basis the amount of the plaintiffs' recovery would be approximately $12,000.00.

It is the claim of the plaintiffs that the formula heretofore referred to constitutes the correct construction of the lease as to the 60 per cent requirement. That claim is controverted by the defendant. It is the claim of the defendant that the 60 per cent requirement obliges it only to have extracted, as of any given date, an amount of gypsum equal to 60 per cent of its total plant requirements over the period between the date it commenced extracting rock on the Carter-Merritt tract in March, 1946, and the date in question. In that connection a portion of the arguments was devoted to the discussion of stockpiled rock. As heretofore noted, the defendant early in the lease period had a contractor remove over 450,-000 tons of rock from the Carter-Merritt tract in a comparatively short period, for which timely payment of royalties was made. That rock was stockpiled and was

sufficient for the defendant's requirements for approximately three years ahead.. Thus up to October, 1949, 100 per cent of the gypsum used in the defendant's Fort Dodge plant came from the Carter-Merritt tract. It was claimed by the plaintiffs in argument that under the formula referred to, even though 100 per cent of the rock used by the defendant in a particular month or year came from the Carter-Merritt tract, the defendant nevertheless was obligated during that same month or year to have extracted rock from that tract which was equal in tonnage to 60 per cent of the rock used. The defendant argued that such claim on its face manifested the erroneousness of the construction placed upon the lease by the plaintiffs.

The defendant claims that since, during the period from the commencement of quarrying operations up until the present time more that 60 per cent of the rock used by it in its Fort Dodge plant has been secured from the Carter-Merritt tract, it is not in default in the performance of the provisions of the lease on its part to be performed. It asks for a declaration to that effect.

Considerable portions of the written briefs and a considerable portion of the oral arguments were devoted to the discussion of implied covenants.

Plaintiffs contend that the law of implied covenants as to mineral rights is applicable to this case. Numerous cases are cited for the proposition that, where the consideration for the lessor's execution of a mining lease is a promise to pay royalties on the mineral extracted, the lessee impliedly covenants to exercise reasonable diligence to develop the leased property and to conduct mining operations on the leased premises in a proper and reasonably diligent manner thereafter. See, e. g., Price v. Black, 1905, 126 Iowa 304, 101 N.W. 1056; McColl v. Bear Creek Coal Mining Co., 1913, 162 Iowa 491, 143 N.W. 532; Freeport Sulphur Co. v. American Sulphur Royalty Co., 1928, 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890; Stoddard v. Illinois Improvement & Ballast Co., 1916, 275 Ill. 199, 113 N.E. 913; Mendota Coal & Coke Co. v. Eastern Ry. & Lumber Co., 9 Cir.,

1931, 53 F.2d 77; Habermel v. Mong, 6 Cir., 1929, 31 F.2d 822, 67 A.L.R. 216. See also, Taylor v. Kingman Feldspar Co., 1933, 41 Ariz. 376, 18 P.2d 649; Jackson v. Gilbert, 1950, 216 Ark. 501, 226 S.W.2d 59; Winn v. Collins, 1944, 207 Ark. 946, 183 S. W.2d 593; Rains Coal Corp. v. Southern Coal Co., 1941, 202 Ark. 1077, 155 S.W.2d 348; Daughetee v. Ohio Oil Co., 1914, 263 Ill. 518, 105 N.E. 308; Pritchard v. McLeod, 9 Cir., 1913, 205 F. 24; People's Gas Co. v. Dean, 8 Cir., 1911, 193 F. 938; Brewster v. Lanyon Zinc Co., 8 Cir., 1905, 140 F. 801; Annotation, 60 A.L.R. 901; Merrill, Covenants Implied in Oil and Gas Leases, Sec. 218 (2d Ed. 1940), especially cases cited in footnote 10, p. 456, and in the 1950 pocket supplement.

The rationale underlying such implied covenants has been summarized by Merrill, supra, as follows (Sec. 221): "We have seen that the courts, in varying language, base the doctrine of implied covenants * * * upon the ground that the lessor's chief remuneration is to be derived from the royalties resultant from development and operation; that this remuneration constitutes his chief inducement for executing the lease, that therefore the lease, in all respects, must be construed as having written into it this duty of diligently promoting the productivity of the premises."

See also, Trust Co. of Chicago v. Samedan Oil Corp., 10 Cir., 1951, 192 F.2d 282, 284, where it is said that a prudent operator "must not forget that the primary consideration to the lessor for the lease is royalty from the production of the lease free of cost of development and operation." Such being the reason for the implied covenants, they are generally considered to be implied in *fact* rather than in *law,* see Merrill, supra, Sec. 220. The statement is often made that such covenants are as much a part of the lease as if expressed therein. See, e. g., Brewster v. Lanyon Zinc Co., 8 Cir., 1905, 140 F. 801, 809; Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, 6 S.W.2d at page 1042, 60 A.L.R. at page 895. See also, Walker v. Howell, 1929, 209 Iowa 823, 226 N.W. 85, 87.

It has been stated that the English courts do not recognize such implied covenants.

Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, 6 S.W.2d at page 1042, 60 A.L.R. at pages 895–896, citing Merrill, supra. A recent Maine decision questions, without deciding, whether the doctrine of implied covenants should be applied in states in which mining is not a substantial industry. United Feldspar & Minerals Corp. v. Bumpus, 1946, 142 Me. 230, 49 A.2d 473. Of this case Merrill says (Sec. 218, 1950 pocket supplement to footnote 10): "This seems to be the first time that the highest court of any American jurisdiction had indicated a disposition to question the implied covenant doctrine."

It has been held that implied covenants of reasonably diligent development and operation are especially necessary to protect the lessor in leases dealing with oil or gas, because of the migratory nature of such substances. See, e. g., Logan Natural Gas & Fuel Co. v. Great Southern Gas & Oil Co., 6 Cir., 1903, 126 F. 623, 625; Brewster v. Lanyon Zinc Co., supra, 140 F. at pages 810–811.

The implied covenant of reasonably prompt development is a separate matter from the implied covenant of reasonably diligent operation. See Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, 6 S.W.2d at page 1043, 60 A.L.R. at pages 897–898, and Annotation, 60 A.L.R. 901. No question is raised as to the defendant's diligence in *developing* the Carter-Merritt tract. Defendant had stripped off the overburden of earth and had commenced quarrying gypsum by March, 1946, when under the lease it did not have to do so until January 1st, 1947. Therefore the only problem as to implied covenants here involves the implied covenant of reasonably diligent operation.

Such an implied covenant was recognized, in dictum, by the Iowa Supreme Court in Price v. Black, 1905, 126 Iowa 304, 101 N.W. 1056, 1057. In that case the lessor of coal land sought an injunction against the lessee's trespassing on the leased premises, claiming the lessee had abandoned the lease. The Supreme Court upheld the trial court in denying the injunction, holding that there had been no abandonment of the lease for failure to produce coal for two years where the operations had been suspended only because of difficulties in operating the mine and where the lessee, shortly prior to the commencement of the action, had gone to considerable expense to install a shaft so that the coal could be mined profitably. The Court expressly refused to consider whether there had been a breach of the implied covenant to work the mine with reasonable diligence or whether damages could be recovered or a forfeiture declared because of such a breach. In McColl v. Bear Creek Coal Mining Co., 1911, 162 Iowa 491, 143 N.W. 532, 534, however, the Price case is cited for the proposition that breach of the duty to prosecute the work with reasonable diligence is a ground of forfeiture. The Court points out, 143 N.W. at page 537: "The distinction between forfeiture and abandonment is that, unlike abandonment, there is no question of intent involved in forfeiture. In forfeiture the question is whether the contract or law has been complied with."

In the McColl case the Court held that the lessee had abandoned its coal mining lease, and affirmed a decree in equity cancelling it. The lessee, in that case, had done nothing during the first two years of a 25 year lease other than to make a few abortive attempts to mine coal during the first few weeks or months of the term. The Court held that this conduct indicated an intent to abandon the lease, and that it would be inequitable to allow the lessee to keep the lessor's reserves tied up for 25 years on the hope that royalties might commence coming in at some time before the end of that period. It is clear that the McColl case involved the implied covenant of reasonably prompt *development* rather than the implied covenant of diligent *operation,* which is claimed to be applicable to the instant case.

█ No other Iowa cases on implied covenants in mineral leases have been cited, and no others have reached the Court's attention. It seems clear that the Iowa Supreme Court has never passed directly on the question of whether an action for damages will lie for breach of the implied covenant of reasonably diligent operation of leased mineral-bearing premises. The Iowa Court has upheld awards

of money damages in cases where express contractual provisions to pay minimum dollar royalties have been breached. See Rowland v. Anderson Coal Co., 1917, 179 Iowa 987, 162 N.W. 321; Saylor Park Land Co. v. Glenwood Coal Co., 1917, 179 Iowa 919, 162 N.W. 203; Flynn v. White Breast Coal & Min. Co., 1887, 72 Iowa 738, 32 N.W. 471. In the light of the latter cases and of the dicta in the Price and Mc-Coll cases, supra, it would seem reasonable to conclude that the Iowa Court, in a proper case, would allow an action for damages for breach of the implied covenant for reasonably diligent operation of a mine on leased premises. Cf. Stoddard v. Illinois Improvement & Ballast Co., 1916, 275 Ill. 199, 113 N.E. 913 (involving abandonment of operations).

The next question to be considered is whether or not the law of implied covenants is pertinent to this case. In Brimmer v. Union Oil Co., 10 Cir., 1936, 81 F.2d 437, 105 A.L.R. 454, certiorari denied, 1936, 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391, the following appears, 81 F.2d at page 440: "An express covenant upon a given subject, deliberately entered into without fraud or mutual mistake, excludes the possibility of an implied covenant of a different or contradictory nature."

See also, to this effect, Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, 6 S.W.2d at page 1043, 60 A.L.R. at page 897; Adkins v. Adams, 7 Cir., 1945, 152 F.2d 489, 492; Frierson v. International Agricultural Corp., 1940, 24 Tenn.App. 616, 148 S.W.2d 27; Weatherly v. American Agricultural Chemical Co., 1933, 16 Tenn.App. 613, 65 S.W.2d 592; Merrill, supra, Sec. 219. Cf. Lautenbach v. Meredith, 1949, 240 Iowa 166, 35 N.W. 2d 870; Hodgson v. Keppel, 1930, 211 Iowa 795, 232 N.W. 725. If, then, the parties to this action have expressly contracted on the subject of defendant's obligation to operate the quarry and the extent of such operation, there can be no implied covenant of reasonably diligent operation. Plaintiffs claim that the implied covenant of reasonably diligent operation arises unless the lease explicitly provides otherwise. The defendant does not controvert that

claim. The question in the present case is whether or not the lease in question contains such an express provision.

The lease does contain a provision on the general subject of defendant's duty to operate the quarry and the extent of such operation. Such provision is made in Paragraph 10 of the lease, providing that defendant must extract 60 per cent. of the requirements of its Fort Dodge plant from the Carter-Merritt tract. It is the claim of the defendant that such provision is of such a character as to prevent a covenant from being implied with respect to the matter of operation. The plaintiffs contend that the only sort of express provision which can defeat such an implied covenant is a provision providing for a minimum royalty. Thus they contend that the defendant is faced with the dilemma of having to concede that the lease provides a definite minimum royalty which it must pay, or that there is an implied covenant of reasonably diligent operation with the 60 per cent formula set as the standard of diligence.

The first portion of the posed dilemma, i.e., a minimum royalty, is not involved in this case. The lease in question is geared to the requirements of a particular plant, and such requirements are determined by the demand for the products of that plant. It appears that during depression days the state of demand for gypsum products might be such that the gypsum plants in the Fort Dodge area would be closed for long periods of time. In the present case, if at any time the state of the demand for the products of the defendant's plant does not warrant operation of the plant, the plaintiffs would receive no royalties as long as that condition existed. Since the royalties the plaintiffs are to receive are geared directly to the demand for the products of the plant, the plaintiffs are not assured of any minimum royalties either on a monthly or annual basis, and are not assured of a steady income from royalties. Their royalties go up or down or cease entirely depending upon the state of demand for the products of the plant.

It is next to be considered whether the plaintiffs' assumption that the only pro-

vision which can prevent the implication of a covenant of reasonably diligent operation is a provision for a minimum royalty is well founded. While most of the cases cited by the plaintiffs on this point were cases in which the courts refused to imply covenants because of provisions providing for minimum royalties, it does not necessarily follow that such provisions are the only provisions which can have that effect. Provisions for minimum royalties relate to the subject of the utilization of mineral land. In the present case the parties covered the matter of such utilization by an express provision which gears the utilization to the requirements of the defendant's plant. It is not believed that a provision for a minimum royalty is the only provision that will meet the requirements of the rule referred to. It is believed that, where the parties to a mineral lease have, as in the present case, made express detailed provisions gearing the rate of mineral extraction to the requirements of a particular plant, the implied covenant of reasonably diligent operation is of doubtful applicability.

It would seem that the controversy resolves into the question of whether the defendant has complied with such express provisions. It is the claim of the plaintiffs that the defendant has not complied with the 60 per cent requirement. The plaintiffs' construction of that requirement, as heretofore noted, is that the defendant is obligated, either each month or each year, to extract from their land an amount of gypsum equal to 60 per cent of its plant requirements for that month or year. If such is the correct construction, then the defendant has not complied with the provisions of the lease. The basic question, then, is whether under the lease the 60 per cent requirement is to be computed on the basis of a monthly or yearly time period. The determination of that question requires a construction of the provisions of the lease.

■ The plaintiffs claim that the lease was prepared by the defendant, and that therefore the language of the lease should be construed against it. Such rule of construction is applicable in certain situations. See, e.g., Pazawich v. Johnson, 1949, 241 Iowa 10, 39 N.W.2d 590, 592; Marty v. Champlin Refining Co., 1949, 240 Iowa 325, 36 N.W.2d 360; Vorthmann v. Great Lakes Pipe Line Co., 1940, 228 Iowa 53, 289 N.W. 746; Andrew v. Austin, 1930, 213 Iowa 963, 232 N.W. 79; 17 C.J.S., Contracts, § 324. It has been stated that: "The rule is never applied to words which are the common language of both parties, even though they are put in writing by one of the parties." 17 C.J.S., Contracts, § 324, p. 754.

In order to determine the applicability of the rule to the present case it is necessary to consider the circumstances preceding and surrounding the execution of the lease and of the option agreement which preceded it.

■ For some years prior to August 22d, 1945, William J. Carter and Maurice J. Breen had attempted to interest gypsum processors in the removal of gypsum rock from the Carter-Merritt property. As early as 1943 Maurice J. Breen had conferred with a representative of the defendant in regard to that matter. Around August 14th, 1945, William J. Carter went to Chicago and had a conference with the defendant's president, Rawson Lizars. Nothing came of that conference. On August 21st, 1945, William J. Carter and Maurice J. Breen went to Chicago and on August 22d, 1945, they conferred with Rawson Lizars, the defendant's president, Arthur O. Graves, its secretary, and some of the other of defendant's officers. Maurice J. Breen had practiced law in Fort Dodge since 1919. He had a broad background of experience as to gypsum leases and other phases of the gypsum industry. Arthur O. Graves, the defendant's secretary, had practiced law in the State of Illinois prior to being associated with the defendant. He had a broad background of experience with gypsum leases and the gypsum business in general. William J. Carter was a real estate broker at Fort Dodge, Iowa. He had been familiar with the gypsum industry in and around Fort Dodge for a long period of time. At one time he served

as receiver of the Universal Gypsum Company of Fort Dodge. During the forenoon of August 22d, 1945, various proposals and counter-proposals were made and considered. Following that conference, in the afternoon of the same day, Arthur O. Graves dictated the option agreement dated August 22d, 1945, in the presence of Mr. Maurice J. Breen and Mr. William J. Carter, which was then executed by William J. Carter and Maurice J. Breen in behalf of the owners of the Carter-Merritt tract. Following the election of the defendant to exercise the option, Arthur O. Graves, in behalf of the defendant, prepared a proposed lease which was sent to Maurice J. Breen. Maurice J. Breen and William J. Carter rejected that lease. Maurice J. Breen by letter and by telephone and William J. Carter by telephone suggested certain changes in the proposed lease. William J. Carter was familiar with the changes suggested by Maurice J. Breen and approved of them. A number of their proposed changes were satisfactory to Arthur O. Graves, and the lease was redrafted to incorporate such changes. A substantial portion of Paragraph 10—the crucial paragraph in this litigation—embodies the suggestions contained in a letter written by Maurice J. Breen. Following the negotiations as to the changes, Arthur O. Graves drafted the lease dated September 24th, 1945, and it was executed by the parties. It has been held that the rule that a writing is to be construed against the one preparing it is not applicable where the contract is prepared with the aid and approval of an attorney for each party to the contract. See Bee Bldg. Co. v. Peters Trust Co., 1921, 106 Neb. 294, 183 N.W. 302. In the present case the lease which is the subject matter of the action was the result of negotiations between parties who were all represented by legal counsel with long and specialized experience in the particular field, and where one of the parties to the negotiations was a real estate broker with experience in that field. It was drafted in final form following careful scrutiny of its proposed provisions and following suggestions and counter-suggestions in regard thereto by such counsel and such broker. The Court is of the view that under such circumstances the rule contended for by the plaintiffs is not of determinative significance.

The construction of the provisions of the lease in regard to the matter of the time period will next be considered. No definite time period was expressed in the lease. Paragraph 10 of the lease, quoted supra, does not say that an amount equal to 60 per cent of defendant's plant requirements must be quarried in each month or in each year. The wording is at least as susceptible to the interpretation placed on it by defendant, of an ever-lengthening term over which 60 per cent must have been taken, as it is to plaintiffs' interpretation. The words "continue to do so" in Paragraph 10 do not link the 60 per cent formula with any definite time period. Paragraph 6 of the lease provides that the royalty payments shall be made on or before the 15th of each month, based on the quantity of gypsum quarried the previous month. Plaintiffs argue that by this provision the parties set the *month* as the unit for reckoning between themselves, and that the 60 per cent formula must therefore be computed on a monthly basis. The language of the lease does not support this conclusion. The use of the word *month* is confined to Paragraph 6, which purports only to deal with the subject of *payments*. Nothing is said therein about the 60 per cent formula, and nothing is said about any time period in any of the paragraphs mentioning the 60 per cent feature. Neither Paragraph 10 nor Paragraph 6, then, expressly set any time period over which to compute the 60 per cent formula. No other provision in the lease purports to set a time period. The plaintiffs, in effect, are asking that the Court hold that the parties impliedly agreed to a monthly or yearly time period.

It has been stated that "a contract includes not only the terms set forth in express words, but in addition all implied provisions indispensable to effectuate the intention of the parties and to carry out the contract * * *." Watson Bros.

Transp. Co. v. Jaffa, 8 Cir., 1944, 143 F.2d 340, 348. See also, Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, 6 S.W.2d at page 1041, 60 A.L.R. at page 895, and authorities cited therein; 17 C.J. S., Contracts, § 328. In Watson Bros. Transp. Co. v. Jaffa, supra, the Court further states, 143 F.2d at page 348: "In determining whether the principle is applicable, the nature of the contract, the circumstances under which it was made, the situation of the parties and the objects they had in view in making the contract should be considered."

See also to this effect, Aultman v. Meyers, 1948, 239 Iowa 940, 33 N.W.2d 400, 405, and numerous cases cited therein. Of course this principle as to implying provisions in contracts is subject to the general limitation that a covenant as to a subject cannot be implied where there is an express covenant on the matter, discussed supra. However, there being no express covenant on the matter of a time period, the question of whether it is necessary to imply an agreement on a time period of a month or a year in order to effectuate the intent of the parties and to carry out the purposes of the contract will next be considered.

During the negotiations the plaintiffs proposed that they be paid a bonus for executing the lease and that the lease provide for the payment of definite minimum royalties. The defendant's president, Rawson Lizars, informed them that he was familiar with the financial history of the gypsum industry and that he had found that royalty agreements which bound gypsum plants to pay for rock not extracted had frequently involved gypsum plants, including the one in the Fort Dodge area of which William J. Carter had been receiver, in financial difficulties leading to bankruptcy or receivership proceedings. He informed them that he would not commit the defendant to pay a definite amount or any amount as royalties in any given time period or otherwise bind the defendant to pay for rock which it had not extracted. To avoid such contingency, but at the same time to provide for what he regarded as an equitable provision as to royalties, he proposed the 60 per cent provision.

It is possible that the plaintiffs misunderstood Rawson Lizars and that they actually did not intend that the option and lease have the meaning that the defendant understood it to have. If such was the case, and the parties never made any agreed exchange of promises with respect to the time period, it would appear difficult to see how they could have entered into any jural relations on the subject such as would give rise to the right to recover damages for its non-observance. Section 622.22, Code of Iowa, 1950, I.C.A., would seem to be applicable. That section provides as follows: "When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it."

This section has been applied by the Iowa Supreme Court on numerous occasions. See annotations to Section 622.22 in Iowa Code Annotated. Applying the rule of construction provided by that section to the present case, it would seem that since the plaintiffs, at the time they executed the lease and option, knew that the defendant would not agree to any minimum royalty provision which would subject it to the contingencies referred to, they had ample reason to believe that the defendant would not assent to linking the 60 per cent requirement with time periods of a month or year, when the necessary effect of such linking would be to subject the defendant to pay for rock not extracted. Conversely, and for the same reasons, the defendant would not have had reason to believe that the plaintiffs understood the lease to mean what plaintiffs now claim.

It is well settled that where contracts are of doubtful meaning the practical construction placed upon them by the parties is of importance. See, e.g., Old Colony Trust Co. v. City of Omaha, 1913, 230 U.S. 100, 118; 33 S.Ct. 967, 57 L.Ed. 1410; Terry v. Muller, 8 Cir., 1951, 190 F.2d 170, 173; Thompson v. Thompson, 8 Cir., 1946, 156 F.2d 581, 586; Darnall v. Day, 1949, 240 Iowa 665, 37 N.W.2d

277, 280; Dodds Co. **v.** Consolidated School Dist., 1935, 220 Iowa 812, 263 N.W. 522; Edwards v. Wagner, 1921, 191 Iowa 822, 183 N.W. 450; Tooey v. C. L. Percival Co., 1921, 192 Iowa 267, 182 N.W. 403. It is also held that the contemporaneous attitudes of the interested parties, whether involving action or inaction, are of significance in determining the actualities of a situation. Irving Trust Co. v. Deutsch, D.C.N.Y., 1932, 2 F.Supp. 971, 989. It appears that William J. Carter, save for a period (or for periods) when he was in Arizona, visited the quarry almost daily and was familiar with the manner by which and the extent to which the defendant was extracting rock from the Carter-Merritt tract. While Maurice J. Breen was at the quarry infrequently he was familiar with the manner and extent of defendant's quarrying operations.

The plaintiffs made no complaint during the 17 month period from October, 1947, through February, 1949, in which they now claim the defendant was not complying with the lease. The plaintiffs made their first complaint on July 15th, 1950. Such complaint was contained in a letter of that date written by Maurice J. Breen. In the same letter he stated that the time period in connection with the 60 per cent clause was one year. In a subsequent letter he stated that he thought that, taken literally, the lease provides for a monthly time period in connection with that provision.

There was certain correspondence between William J. Carter and the defendant which tends to indicate the view which William J. Carter took of the 60 per cent requirement early in 1949. Under Paragraph 12 of the lease, it is provided that if the Lessors send it the bill for taxes owing, the Lessee is obligated to pay the real estate taxes on the leased property, but may deduct the amount of such taxes from the first royalty payment due thereafter. In a letter dated December 31st, 1948, the defendant's tax department wrote to William J. Carter making inquiry as to the status of the taxes for the periods after 1946. In response thereto William J. Carter wrote the defendant a letter dated January 8th, 1949, which reads, in part, as follows: "Under the lease, if there is any money due us on royalties, Certain-teed are to pay the taxes, but as there was no rock removed in the year 1948, the taxes were paid by us. There will be no further taxes due until March 31, 1949. If at that time, any rock has been removed, it will be up to Certain-teed to pay the taxes and we will furnish them with statement of the amount due. In the event no rock has been removed and no royalties are due, we will pay the taxes."

The relation between William J. Carter and the other owners of the property is that of tenants in common. It is well settled that the mere fact that persons are tenants in common does not give rise to an agency relationship between them. 14 Am.Jur., p. 78. Ordinarily the actions or undertakings of one tenant in common are not binding on his cotenants. 14 Am.Jur., p. 147. While William J. Carter could not bind his cotenants by his statements, yet since he was an interested party in negotiating the lease and was very familiar with the entire situation and background, his contemporaneous attitude as to and contemporaneous understanding of the 60 per cent provision is enlightening as to the actualities of the situation.

In the course of oral argument it was claimed that the reason that the plaintiffs did not until July 15th, 1950, make complaint that the defendant was not complying with the terms of the lease was that until shortly prior to that time all of the rock that the defendant was using in its plant came from the Carter-Merritt tract. The defendant points out that under the formula which the plaintiffs contend represents the correct construction of the 60 per cent provision, the defendant's operations in 1947, 1948 and the forepart of 1949 were even more violative of the 60 per cent provision than they were at the time the plaintiffs made complaint; and that in effect the plaintiffs claim that their claimed formula is applicable at certain times but not at others.

The plaintiffs claim, as heretofore noted, that the lease in question includes an implied covenant of reasonably diligent

operation. They further claim that such implied covenant carries with it the obligation of *continous* operation. They cite, among other cases, the case of Mendota Coal & Coke Co. v. Eastern Ry. & Lumber Co., 9 Cir., 1931, 53 F.2d 77, at page 80, where the Court states: "Where, as here, a lease is entered into with no provision for minimum royalties required, there must necessarily be a strong implied obligation for the lessee to develop and mine the coal diligently and continuously."

See also, Mansfield Gas Co. v. Alexander, 1911, 97 Ark. 167, 133 S.W. 837. The plaintiffs also contend that the lease itself provides for *continuous* quarrying operations. This last contention will be first considered. They argue that the words "continue to do so" in Paragraph 10 of the lease impose an obligation on the defendant not to have gaps of any appreciable length of time in its quarrying operations. That clause does *not* say, however, that the defendant will *extract rock* continuously. The words "continue to do so" refer back not to a simple promise to extract rock, but to the 60 per cent requirement, as to which no period of time is specified. It is heretofore noted that whether the defendant will have any requirements at all is dependent upon the state of the demand for the products of its plant. The phrase "continue to do so" in Paragraph 15 to which the plaintiffs call attention would seem not to be any more helpful to them than are the same words in Paragraph 10. Paragraph 15 deals with the methods defendant is to employ in extracting rock from plaintiffs' land, rather than with the extent or continuity of such extraction. Plaintiffs contend that an inference that constant quarrying was agreed on is also raised from Paragraph 7 of the lease, providing that accounts of gypsum extracted shall be furnished to the Lessors at their request at any and all reasonable times, and giving the Lessors access to Lessee's weight and production records to determine whether at least 60 per cent of Lessee's gypsum requirements are being extracted. However, the paragraph does not explicitly require continuous quarrying and does not purport to deal with that subject. The lease does not expressly impose on the defendant a duty to continuously extract rock.

With respect to the claim of the plaintiffs that the implied covenant of reasonably diligent operation carries with it the obligation of continuous operation, it would seem that the matter of continuity is not something apart from the matter of reasonable diligence, but that it is merely an element of diligence.

 The plaintiffs claim that the defendant is attempting to · satisfy the claimed requirement of diligence by what is known as "averaging." In that connection they cite the following cases in support of the proposition that, unless the parties expressly provide otherwise, a failure to pay royalties during one period cannot be excused by the fact that royalties in excess of a required minimum or in excess of a reasonable minimum have been paid in a prior period. Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, 6 S.W.2d at page 1044, 60 A.L.R. at pages 898–899; Smith v. Godfrey, Tenn.Ct.Ch. App., 1898, 48 S.W. 303; Corona Coal Co. v. Hendon, 1926, 214 Ala. 139, 106 So. 855; Vandalia Coal Co. v. Underwood, 1913, 55 Ind.App. 91, 101 N.E. 1047; Chase v. Knickerbocker Phosphate Co., 1898, 32 App.Div. 400, 53 N.Y.S. 200, 225; Woodruff v. Gunton, 1909, 222 Pa. 384, 71 A. 851; Greenough v. Colonial Colliery, 1938, 132 Pa.Super. 270, 1 A.2d 174; Minnehaha Land & Inv. Co. v. Consol. Sand & Stone Co., 1935, 64 S.D. 48, 264 N.W. 198; Elkhorn Coal Corp. v. By-Products Coal Co., 1931, 237 Ky. 436, 35 S.W.2d 898. The plaintiffs thus conclude that the fact that the defendant made large royalty payments in 1946 and 1947 does not excuse it from compliance during subsequent months and years with the formula which the plaintiffs claim is the applicable formula for the computation of royalty payments for such subsequent months and years. In all of the cases listed above, other than the Freeport Sulphur case, there were express minimum royalty agreements. As heretofore noted, the lease in the present case contains no minimum royalty provision. In the Freeport Sulphur case there was no minimum royalty provision. In that case, which involved

a sale of land for consideration of cash and royalties, the Texas Supreme Court refused to imply a covenant for reasonably diligent development, because the parties had expressly contracted on that matter, but the Court did imply a covenant for reasonably diligent operation. It was held that under such a covenant a shutdown of mining operations for a period of two years presented a jury question as to whether the lessee had conducted operations with reasonable diligence. Thus, what was held in that case was that a covenant of reasonably diligent operation should be implied, and that the question as to whether there was a breach of that covenant was to be determined by the trier of the facts. It has been heretofore noted that the Court is of the view that it is doubtful whether in the present case there is a satisfactory basis for the implication of covenants. As stated in Adkins v. Adams, 7 Cir., 1945, 152 F.2d 489, 492: "The courts cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties in the contracts made. Before a covenant will be implied in the express terms of a contract, it must appear therefrom that it was so clearly in the contemplation of the parties as that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to imply such covenant in order to give effect to and effectuate the purpose of the contract as a whole."

The Texas Supreme Court, in the Freeport Sulphur case [6 S.W.2d at page 1044], quotes the Eighth Circuit case of Brewster v. Lanyon Zinc Co., 1905, 140 F. 801, 814, as setting forth the test of reasonable diligence, viz.: "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

Even if a covenant of reasonably diligent operation were to be implied in the present case, and giving due weight to plaintiffs' contentions that the matter of continuity of operation is an element of diligence, the Court, as the trier of the facts in this case, is of the view that the defendant has met the test of diligence formulated in the Eighth Circuit case quoted above.

It is also to be noted that where a mining lessee has made large expenditures in developing the leased premises, the courts are very reluctant to decree a forfeiture of the lease for breach of an implied covenant unless it is the only adequate remedy available to the lessor. See, e.g., W. T. Waggoner Estate v. Sigler Oil Co., 1929, 118 Tex. 509, 19 S.W.2d 27; Union Sulphur Co. v. Texas Gulf Sulphur Co., Tex.Civ.App., 1931, 42 S.W.2d 182; Wisdom v. Minchen, Tex.Civ.App., 1941, 154 S.W.2d 330. Cf., Nelson v. Schoettgen, 1934, 1 Cal.App.2d 418, 36 P.2d 665.

The plaintiffs contend that unless their construction of the lease be adopted the defendant will be able to make use of the surface of their land during periods when they are receiving no rent for such use. Paragraph 8 of the lease gives the Lessee extensive rights to use the surface of the leased land, including the right to haul over said premises rock quarried from other lands, "and for any other uses and purposes necessary or convenient in connection with Lessee's mining or quarrying operations before, during and after the mining, quarrying and removal of the gypsum or plaster rock from the real estate and premises of Lessors."

The defendant contends that the rent is included in the royalty payments and that, since it has at all times been ahead of the 60 per cent requirement, it has in effect paid the rent for the use of the land in advance, and that the plaintiffs should not be heard to complain because defendant's rent payments are made in advance instead of currently. The Court is of the view that the position of the defendant is well taken.

On the over-all aspect of the case, the defendant asserts in a somewhat hurt and injured manner, that because of plant expansion on the part of the defendant not contemplated by the plaintiffs at the time the lease in question was entered into and because of its increased shipments to other

processors and because, during the entire period of the lease it has extracted from the Carter-Merritt tract rock equivalent to 75 per cent of its requirements instead of 60 per cent, the plaintiffs have received as royalties to date amounts which were beyond the fondest expectations of the plaintiffs at the time the lease was entered into, and that the performance of the defendant under the lease has not been a case of "too little and too late," but, if anything, "too much and too soon." The defendant further asserts that the plaintiffs have taken and do take inconsistent and contradictory positions in regard to the construction of the 60 per cent provision, while its position in regard thereto has been consistent throughout. The lease in question was negotiated by parties who dealt at arms' length. Throughout the negotiations their rights were safeguarded by experienced legal counsel. The parties were represented in the negotiations by men who were well and thoroughly informed as to matters having to do with the leasing of gypsum land. Its provisions were carefully and thoroughly scrutinized by such representatives before it was executed. For a period of several years the contemporaneous attitude of the parties as to its construction was the same. The plaintiffs now make a belated claim for a different construction. Under the lease the defendant has extracted rock from the plaintiffs' land in an amount which is substantially in excess of 60 per cent of its requirements from the commencement of the lease up to date, and the plaintiffs have received as royalties amounts in excess of what they had any reason to anticipate at the time they executed the lease. Under the construction of the lease claimed by the plaintiffs, the defendant would, for many of the months as to which the plaintiffs claim it is in default, have to pay for rock not quarried by it even though during such months 100 per cent of the rock being used in its plant came from the Carter-Merritt tract. The construction of the lease claimed by the plaintiffs would, it is believed, bring about unfair and unjust results.

The plaintiffs cast their pleading in this action in the form of an application for declaratory relief with dependent coercive relief. The plaintiffs prior to the commencement of the action had, so far as they were concerned, elected to terminate the lease because of the alleged violation of its terms and provisions by the defendant and had given the statutory notice under the Iowa law. Such notice is a prerequisite to an action of detainer to recover possession of real estate. The plaintiffs' present action is in reality one for the recovery of the leased premises as against the defendant, who they claim is holding over after its lease had been terminated, because of its violations of the terms and provisions thereof and for the recovery of damages for the violations that gave rise to the termination, rather than an action for declaratory relief. That discrepancy is not a matter of practical importance, since there is diversity of citizenship and the requisite jurisdictional amount is present, and the parties have fully litigated the issues between them in connection with the lease. The judgment herein can be framed in accordance with the realities of the litigation. The real question litigated in this case was whether the defendant had violated the terms and provisions of the lease. Violations of the provisions of a lease are not presumed. In this case the burden was upon the plaintiffs to establish that the defendant had violated the terms and provisions of the lease. It is the holding of the Court that the plaintiffs have not sustained that burden. It is the order of the Court that judgment shall be entered herein in favor of the defendant.